[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-15912
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 20, 2012
JOHN LEY
CLERK

D. C. Docket No. 4:10-cr-00001-RLV-WEJ-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STEPHEN G. HOUSE,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(June 20, 2012)

Before BARKETT and PRYOR, Circuit Judges, and BUCKLEW,* District Judge.

_____

* Honorable Susan C. Bucklew, United States District Judge for the Middle District of
Florida, sitting by designation.

PRYOR, Circuit Judge:

When the driver of a motor vehicle notices blue lights flashing in the rear view mirror, the driver cannot help but feel a sense of dread. The public reposes a special trust in the peace officers we empower to patrol our highways. That power includes the authority to disrupt the flow of motor vehicle traffic, often traveling at high speeds, and the power to detain a driver and vehicle on the side of a road, which can be a dangerous place. This appeal involves a federal officer with limited authority who repeatedly usurped the power to patrol traffic, violated the civil rights of motorists, abused the public trust, and lied about it in official reports.

Stephen G. House, a former officer of the Federal Protective Service, appeals his convictions and sentences for eight counts of willfully depriving a person of the constitutional right to be free from unreasonable seizure by a law enforcement officer, 18 U.S.C. § 242, and four counts of making false statements in a matter within the jurisdiction of a federal agency, 18 U.S.C. § 1001. House raises seven issues on appeal: (1) whether the record contains sufficient evidence to support his convictions, (2) whether the district court erred in instructing the jury, (3) whether the district court improperly interjected itself into the trial, (4) whether the district court improperly excluded evidence, (5) whether the

2

prosecutor improperly commented on House's decision not to testify, (6) whether his trial counsel provided ineffective assistance, and (7) whether the cumulative effect of any errors deprived him of a fair trial. The first two issues are interrelated because the district court erred in instructing the jury that a traffic stop is unreasonable under the Fourth Amendment whenever conducted by a law enforcement officer acting without jurisdiction or authority. The Supreme Court has ruled that a traffic stop is reasonable under the Fourth Amendment when supported by probable cause or reasonable suspicion even if it is inconsistent with agency policy, Whren v. United States, 517 U.S. 806, 813–16, 116 S. Ct. 1769, 1774–76 (1996), or state law, Virginia v. Moore, 553 U.S. 164, 173–76, 128 S. Ct. 1598, 1605–07 (2008). The record nevertheless establishes that this error is harmless as to four of House's convictions for unreasonable seizures because the jury discredited House's accounts of probable cause or reasonable suspicion when it convicted him of making false statements in four incident reports. We affirm four of House's eight convictions for willful unreasonable seizures and affirm his four convictions for making false statements, but we vacate the remaining convictions for willful unreasonable seizures. All of House's other arguments fail. We remand this matter to the district court for further proceedings consistent with this opinion.

# I. BACKGROUND

Beginning in 1999, Stephen G. House worked for the Federal Protective Service as a law enforcement officer and inspector. The Federal Protective Service is a law enforcement agency with jurisdiction over properties owned and operated by the General Services Administration. As a Federal Protective Service officer, House wore a uniform with a badge, patches on the uniform identifying him as a federal law enforcement officer, a name tag, and a utility belt in which he carried a handgun, a radio, and handcuffs. He also operated a motor vehicle with Federal Protective Service markings, sirens, emergency lights on the roof and in the grille, and a phone number listed on the rear.

In 2010, a federal grand jury returned a superseding indictment that charged House with eight counts of depriving a motorist of the constitutional right to be free from unreasonable seizure by a law enforcement officer, 18 U.S.C. § 242, and four counts of making false statements in a matter within the jurisdiction of the Federal Protective Service, 18 U.S.C. § 1001. Count one charged an unlawful traffic stop of Truman Padgett on July 28, 2006. Count two charged an unlawful traffic stop of Truman Padgett on November 28, 2006. Count three charged an unlawful traffic stop of Sonya Caravalho on February 26, 2007. Count four charged an unlawful traffic stop of Anthony Rivas on July 25, 2007. Count five

4

charged submission of an incident report containing materially false statements regarding the stop of Rivas. Count six charged an unlawful traffic stop Joseph Kinnamont on April 30, 2008. Count seven charged an unlawful traffic stop of Davis Wibel on December 3, 2008. Count eight charged submission of an incident report containing materially false statements regarding the stop of Wibel. Count nine charged an unlawful attempted traffic stop of Daniel McFarland on January 9, 2009. Count ten charged submission of an incident report containing materially false statements regarding the stop of McFarland. Count eleven charged an unlawful traffic stop of Reginald Thompson on April 15, 2009. Count twelve charged submission of an incident report containing materially false statements regarding the stop of Thompson.

Immediately after the jury was administered its oath at House's trial, the district court explained to them that it would charge them about the law after the presentation of the evidence. The court also instructed the jury, "Don't start making up your mind about the guilt or innocence of the defendant until you have heard the whole case. We have a bad habit as human beings of letting first impressions control what we think about something. Wait until you hear it all."

At trial, the government presented testimony from several current and former officers of the Federal Protective Service about the limitations imposed

5

upon their authority by agency policy and about House's history of violating that policy. The officers testified that agency policy prohibited officers from conducting traffic stops for minor traffic violations outside of federal property in the State of Georgia. Agency policy likewise prohibited officers from activating the emergency lights on their vehicles outside of federal property, except in response to a life-threatening emergency, while in hot pursuit of a felon, or with prior approval from a Federal Protective Service Mega Center Operator or a supervisor.

Agency policy required officers who conducted a traffic stop or activated the emergency lights on their vehicles to submit an incident report on a numbered agency form, General Services Administration Form 3155. Dewayne Andrews, a Regional Director, testified that it was important for officers to be truthful in the reports, both because the Federal Protective Service used the reports in determining whether an officer's use of his emergency lights was permissible and because other law enforcement agencies used the reports in criminal prosecutions. Russell Dingman, a Senior Instructor and Program Manager at the Federal Law Enforcement Training Center, also testified that it was important that a report include truthful information regarding "all of the facts of the case, the who, what, when, where, and how of the case." Dingman explained that other agencies used

the reports in deciding whether to initiate criminal prosecutions, and he testified that false statements in a report could ruin any case an agency attempted to pursue based upon events described in that report.

Three officers also testified that House had been reprimanded about violating agency policy regarding traffic stops on several occassions during his career with the Federal Protective Service. Andrews; John Curtis Glynn, Jr., a former District Director; and Shirley Reed, a Risk Management Branch Chief, each testified about personally explaining to House that his authority did not encompass stopping motorists for minor traffic violations outside federal property. Glynn testified that he had prepared a written reprimand of House for conducting a traffic stop without authority, but that he had not delivered the reprimand after meeting with House and warning him about agency policy regarding traffic stops. Glynn explained that his main concern had been that House understood the policy and recognized that violating that policy "could lead to a more severe action by [the Federal Protective Service]." Reed testified that, after she had received a report that House had conducted a traffic stop without authority, she spoke with House to ensure that he understood agency policy regarding traffic stops. Andrews testified that he received notice of an internal agency investigation of House premised upon allegations that House had conducted traffic stops without

7

authority, and that House's right to drive his law enforcement vehicle home from work was temporarily suspended because of that investigation. Andrews stated that he had personally told House that "he had to stop" conducting traffic stops for minor traffic violations outside federal property and that he had specifically instructed House that, even in situations where House believed he was the target of road rage by other drivers, agency policy required him to allow local authorities to resolve the matter.

During the examination of Reed, the prosecutor asked her, "If [Federal Protective Service officers] have probable cause to make a traffic stop, they are violating the civil rights of the motorists?" Reed answered in the affirmative, and House objected and asserted, "That's not true." The district court replied, "It is too. It's got some if's and and's to it. We are getting to the if part. I think you are farafield [sic]." The district court then sustained House's objection. House did not object to the district judge's comment, and he did not request a contemporaneous limiting instruction as to either the prosecutor's question, Reed's response, or the judge's comment. Not long after the district court sustained House's objection, the prosecutor asked Reed, "If [Federal Protective Service officers] have probable cause and they do detain the individual, they have done something unlawful?" Reed answered, "Correct." House did not object to

8

the prosecutor's question or Reed's response, nor did he request a limiting instruction as to either.

The government also presented testimony from the seven motorists whose civil rights House was charged with violating. These motorists testified about their encounters with House. In addition, the motorists whose encounters with House were recorded in the incident reports described in the indictment testified about the assertions in House's reports.

Padgett testified that, on July 28, 2006, he was sitting in his vehicle at a red light waiting to turn left when he observed House approach quickly from the rear in a black, unmarked vehicle and pull into the lane behind Padgett. When the light turned green, Padgett turned left and then proceeded forward in the right lane of a four-lane road, with House following closely behind him. House eventually passed Padgett and then moved back into the right lane in front of Padgett. When a vehicle in front of House slowed to make a turn, House, followed by Padgett, moved into the left lane. House then applied his brakes and abruptly brought his vehicle to a stop for no apparent reason, forcing Padgett to slam his brakes to avoid hitting the rear of House's vehicle. House then allowed Padgett to pass him, pulled behind Padgett, and activated his emergency lights. Padgett testified that he had not exceeded the speed limit, had properly signaled before making each

9

lane change, had not followed another vehicle too closely, and had not cut off another vehicle while changing lanes, but he believed he was legally obligated to stop because a law enforcement officer had ordered him to do so.

After Padgett pulled his vehicle over, House approached Padgett's vehicle in uniform with his hand on his pistol. House yelled at Padgett, saying that Padgett was "about to get what [he] deserved" and that House had called 911. House then returned to his vehicle, and House and Padgett waited 45 minutes for local law enforcement officers to arrive. Padgett did not feel that he was free to leave because House still had his lights on and had told Padgett that local law enforcement officers were on their way. When the local law enforcement officers arrived, they listened to both House's and Padgett's accounts of the incident and then issued Padgett a citation for aggressive driving. Padgett hired a lawyer to contest the aggressive driving charge. Padgett and his lawyer attended six to eight court hearings in relation to the charge over a two-year period, but House never appeared to testify. The charge was eventually dismissed.

Padgett testified that, on November 28, 2006, he was driving 68 miles per hour in the left lane of a four-lane road where the speed limit was 65 miles per hour when he observed House's black vehicle approaching him from behind at a high rate of speed. House sped around Padgett in the right lane and then moved

back into the left lane in front of Padgett, narrowly missing his front bumper and forcing him off the roadway. House caused Padgett to drive off the road; if Padgett had not stopped his vehicle, he would have hit House's vehicle. House stopped his vehicle 25 to 30 feet in front of Padgett's vehicle, and both Padgett and House left their vehicles.

House was wearing a uniform and carrying a pistol, and Padgett recognized House as the officer who had pulled him over the previous July. House yelled at Padgett, saying that when a vehicle approaches from behind, Padgett should move out of the way. The encounter lasted ten minutes, after which House drove away. Padgett believed he was detained during those ten minutes because "when somebody runs you off the road at a high rate of speed, and they are dressed in a police uniform, they are detaining you." After House left, Padgett called 911 because he feared that House had no regard for anyone's safety.

Sonya Caravalho testified that, on February 26, 2007, she was driving in the left lane on Interstate 75 when she observed House approach her from behind in a black, unmarked vehicle at a very high rate of speed. Caravalho moved into the center lane to allow House to pass her, then returned to the left lane. As House drove past her, Caravalho observed that he was wearing a uniform. She then observed House driving erratically, flashing his lights at vehicles in front of him

11

and slamming his brakes, and she moved back into the center lane because she was afraid House was going to run into another vehicle. After Caravalho returned to the center lane, House slammed his brakes and allowed Caravalho to pass him. House then moved behind her, activated his emergency lights, and directed her to pull over. Caravalho did not believe she had any choice but to stop because a law enforcement officer had directed her to pull over. Caravalho initially testified that, to her knowledge, she had done nothing to merit being pulled over; she had remained at least a car's length or more behind House's vehicle and had not followed House's vehicle too closely. On cross-examination she conceded that she may have been driving slightly over the speed limit, though there were vehicles in front of her going faster than she was.

After Caravalho pulled over her vehicle, House approached her window, yelled at her, saying she should not follow a federal agent, told her that he was going to call the Georgia State Patrol, took her driver's license, and returned to his vehicle. Caravalho did not believe she was free to leave. After 10 to 15 minutes, House returned to Caravalho's vehicle, told her there were no state officers available, and returned her driver's license to her. House did not issue Caravalho a citation or arrest her. House filed a written report about his traffic stop of Caravalho, in which he stated that Caravalho had been driving recklessly before he

12

stopped her. Caravalho testified that the report contained numerous false statements.

Lee Anthony Rivas testified that, on July 27, 2007, he was driving no more than 15 to 20 miles per hour in the lane immediately adjacent to the far left lane on Interstate 75 during heavy rush hour traffic. In anticipation of merging into the left lane, Rivas activated his turn signal and checked for traffic in his rearview and side mirrors; he noticed House in the left lane driving a black, unmarked vehicle, positioned far enough behind Rivas's vehicle that Rivas believed he could safely merge in front of House. Rivas merged into the left lane in front of House, at which point House accelerated toward Rivas's vehicle and then abruptly applied his brakes, flashed his headlights, and honked his horn. House then merged onto the left shoulder of the road, pulled up beside Rivas, rolled down his window, and accused Rivas of cutting him off. After Rivas denied House's accusation, House told Rivas to pull over, and House activated his emergency lights. Rivas pulled into the left lane behind House. Rivas was certain that he had not violated any traffic laws, but the fact that House had emergency lights on his vehicle led Rivas to believe he was legally obligated to stop.

After Rivas pulled over, House approached Rivas's car in uniform, his demeanor suggesting that he "wanted to punch [Rivas] in the face," and told Rivas

13

in a "very scary voice" that he was a federal agent and that he "was going to get [Rivas] for destruction of government property." Rivas testified that he never came close to striking House's vehicle with his own. Rivas called 911, and the operator told him that House had called local law enforcement officers. Rivas did not believe that he was free to leave. When the local law enforcement officers arrived, they told Rivas he was free to go; they neither arrested Rivas nor issued him a citation. Rivas had waited on the side of the road for 45 minutes.

During his direct examination of Rivas, the prosecutor submitted into evidence the incident report House had filed regarding House's encounter with Rivas. House stated in the report that Rivas had merged into the far left lane of Interstate 75 in front of House's vehicle and had "jammed on his brakes"; that Rivas had spun sideways in front of House and forced House to "brake[] hard" and to veer into the emergency lane to avoid striking Rivas's vehicle; that House had activated his blue lights to prevent other traffic from striking him, at which point Rivas had pulled into the emergency lane; that House had remained on the highway, rolled down his window, and advised Rivas to drive more carefully; that Rivas had "continued driving in the emergency lane" and had swerved toward House's government vehicle twice, nearly striking the government vehicle; and that House had then activated his blue lights, pulled over, approached Rivas's

14

vehicle and told Rivas that he had called local law enforcement.  The prosecutor gave Rivas a copy of the report to reference while the prosecutor questioned him.

Rivas testified that House's report was false.  Rivas testified that he had not "jam[med] on his brakes" immediately after moving into the left lane in front of House; that he had not lost control of his car or spun sideways in front of House; that his vehicle was never sideways in the lane; that he had pulled into the emergency lane only after House activated his blue lights to "pull [him] over"; that House had not remained on the highway after he activated his blue lights; and that he had not driven in the emergency lane, swerved toward House's vehicle, or nearly struck House's vehicle.

Joseph Kinnamont testified that, on April 30, 2008, he was driving in the left lane on Interstate 75, passing tractor trailer trucks that were traveling in the middle and right lanes, when House approached him from behind at a very high rate of speed in a marked law enforcement vehicle.  House maneuvered his vehicle within four to five feet of Kinnamont's vehicle and flashed his headlights. Kinnamont understood that House wanted to pass him, but with a tractor trailer on one side of him and a guard rail on the other, Kinnamont could not move out of the lane.  Kinnamont believed that he "had to be going over the speed limit to be passing the tractor trailers," but he was not driving aggressively.  House was

15

driving quickly enough to "catch[] [Kinnamont] like [Kinnamont] was standing still."

After Kinnamont passed the tractor trailers, House activated his emergency lights, slowed his vehicle, and began "escorting" Kinnamont to the side of the road. As Kinnamont was slowing his vehicle to a stop on the shoulder of the road, House turned off his emergency lights and sped away. Kinnamont decided to report House, so he merged back onto the road and accelerated, in an attempt to catch House's vehicle and record the phone number listed on the rear. As Kinnamont approached House's vehicle, Kinnamont flashed his headlights in an attempt to cause House to slow down, but Kinnamont remained somewhere between 100 and 200 yards behind House, and Kinnamont did not drive faster than the posted speed limit. House then drove onto the shoulder of the road and stopped his vehicle, and once Kinnamont caught up to House, Kinnamont stopped his own vehicle behind House's.

House stepped out of his vehicle with his hand on his revolver, appearing "extremely angry," and asked Kinnamont what his problem was. When Kinnamont told House that he intended to file a complaint against House, House became "mad as a hornet," told Kinnamont that he was going to restrict Kinnamont's movement, backed his vehicle onto Interstate 75 in oncoming traffic,

16

and then pulled his vehicle over behind Kinnamont's vehicle. Kinnamont then called 911. After parking behind Kinnamont, House informed Kinnamont that his movement was restricted, and that House had summoned local law enforcement. Kinnamont did not believe he was free to go because House had told him his movement was restricted and because House had a badge and a gun.

When the local law enforcement officers arrived, they questioned House and Kinnamont, and Kinnamont testified that House provided a false account of the encounter. The local law enforcement officers arrested Kinnamont, charged him with aggressive driving, impeding the flow of traffic, and following too closely, impounded his car, and took his driver's license. Kinnamont was released from jail five hours later, and the charges against him were eventually dropped. House filed a written report of his encounter with Kinnamont, in which he alleged that Kinnamont had been driving recklessly at the time of the encounter. Kinnamont testified that the report contained numerous false statements.

During the prosecutor's direct examination of Kinnamont regarding the charges filed against him, Kinnamont testified that the charges had been dismissed, and House objected on the basis that Kinnamont was "going to explain why the charges were dropped." In response to House's objection, the district court said to the prosecutor, "We will get the court records and see why they were

17

dropped, if you don't have them." The prosecutor replied, "I don't have those records." The district court then stated, "We will have them before the trial is over. I think the jury needs to know." House did not object. The government later introduced the records into evidence, and House explicitly stated that he had "[n]o objection" to their introduction.

Davis Wibel testified that he turned left into the left lane of a four lane road around 5:30 a.m. on December 3, 2008. There was no traffic on the road when Wibel made the turn. As Wibel was accelerating up to the speed limit, House appeared behind him in a government vehicle and began "tailgating" his vehicle, although there was no traffic in the right lane. Wibel moved into the right lane to allow House to pass him, but House did not pass him. As the two vehicles traveled down the road, House retreated two to three car lengths behind Wibel, at which point Wibel merged into the left lane to pass a vehicle traveling in the right lane. House then sped up and "got in behind" Wibel, "right on [Wibel's] bumper." Wibel merged back into the right lane, but again House did not pass him. To avoid trouble, Wibel reduced his speed, and House then passed him. When House was two to three car lengths in front of Wibel, Wibel merged back into the left lane. House then slammed his brakes, forcing Wibel to merge back into the right lane to avoid hitting House's vehicle. Wibel had not followed House too closely

18

or driven aggressively, and there was no other traffic on the road and no apparent reason for House to have applied his brakes. Wibel took House's conduct as "an act toward [him]"; he was scared and sped up in an attempt to "put distance between" himself and House, but he never got so far ahead of House that he lost sight of House behind him.

A short time later, a local law enforcement officer activated his emergency lights to stop Wibel, at which point House activated his emergency lights, and Wibel, the local officer, and House all stopped their vehicles on the side of the road. Wibel had not violated any traffic laws and was not driving aggressively. On direct examination, Wibel testified that he believed he was obligated to stop his vehicle because two law enforcement officers were pulling him over, but on cross examination, he testified that it was the local officer, not House, who caused him to stop. The local officer questioned House and Wibel, and Wibel testified that House gave the local officer a false account of the events that had transpired between them. The local officer arrested Wibel and charged him with aggressive driving. Wibel was released from jail several hours later. He pleaded nolo contendere to the aggressive driving charge because he was told it would cost more money to dispute it. John Beal, the local law enforcement officer who arrested Wibel, testified that House had been "insistent upon having [Wibel]

19

arrested" and that House had led Beal to believe that House was a certified peace officer in the State of Georgia. In fact, although House had been certified as a peace officer in 1984, his certification was revoked in 1992 and was never renewed.

During his direct examination of Wibel, the prosecutor submitted into evidence the incident report House had filed regarding House's encounter with Wibel. House stated in the report that Wibel had accelerated to prevent House from passing him; that Wibel had driven so fast that House had lost sight of Wibel's vehicle; that, after his vehicle had retreated behind House's vehicle, Wibel had approached House's vehicle from the rear so quickly that House had "expected impact"; and that Wibel had passed House in the right lane and then cut back in front of House in the left lane, narrowly missing the bumper of House's vehicle. The prosecutor gave Wibel a copy of the report to reference while the prosecutor questioned him.

Wibel testified that House's report was false. Wibel testified that he had not accelerated to prevent House from passing him; that he had not driven out of sight of House's vehicle, that the only reason he had "c[o]me up on the rear of [House's] vehicle" was because House had hit the brakes, and that he had not cut in front of House's vehicle so that he narrowly missed the bumper of the vehicle.

Wibel also testified that House had not disclosed in his report that Wibel had changed lanes to allow House to pass him, that House had tailgated Wibel, or that House had slammed his brakes after Wibel had merged into the left lane behind House.

Daniel McFarland, a police officer with the City of Atlanta Police Department, testified that he was driving faster than the speed limit on Interstate 75 around 6:15 a.m. on January 9, 2009, when he noticed House driving a law enforcement vehicle in the adjacent lane. McFarland was in his personal vehicle and was not in uniform. McFarland decreased his speed when he saw House's vehicle so that the two vehicles were traveling the same speed, with McFarland's vehicle roughly a car length behind House's vehicle. House then slowed until his vehicle was parallel with McFarland's vehicle, then slowed again and merged behind McFarland, then merged into the lane to the right of McFarland and accelerated until his vehicle was parallel with McFarland's vehicle, then accelerated again and merged in front of McFarland. House then decreased his speed to 35 or 40 miles an hour, even though the speed limit was 50 miles per hour and there was no traffic on the Interstate at the time. McFarland drove behind House for roughly a mile and then changed lanes, accelerated up to the speed limit, and passed House.

21

House then activated his emergency lights, and McFarland believed he was legally obligated to pull over. McFarland began to pull over to the right, and House followed him. As McFarland was slowing his vehicle to a stop on the right shoulder of the road, House turned off his emergency lights and continued driving. McFarland pulled back onto the interstate behind House. When McFarland caught up to House, House slammed his brakes for no apparent reason, forcing McFarland to slam his own brakes to avoid running into House's vehicle. McFarland then accelerated until he was parallel with House and motioned for House to pull over; McFarland wanted to ask House about the reasons for House's actions. Both drivers pulled off of the interstate, and McFarland got out of his vehicle to speak with House. House yelled at McFarland, telling him to return to his vehicle, and McFarland returned to his vehicle and drove away.

During the prosecutor's direct examination of McFarland, he submitted into evidence the incident report House had filed regarding House's encounter with McFarland. House stated in the report that McFarland had initially approached House in House's lane and had come very close to the rear of House's vehicle; that House had changed lanes to avoid McFarland; that McFarland had woven in and out of traffic; that McFarland had nearly sideswiped House's vehicle; and that McFarland had approached House's vehicle with his hands in his pockets shouting

22

"I am a police officer" when the two drivers had pulled off of the interstate. House did not allege that McFarland had been speeding. The prosecutor gave McFarland a copy of the report to reference while the prosecutor questioned him.

McFarland testified that House's report was false. McFarland testified that he and House were driving in different lanes when he had initially approached House's vehicle, that he had not come close to striking House's vehicle from the other lane as he approached the vehicle, that House had not had to change lanes to avoid him, that he had not woven in and out of traffic, that he had not nearly sideswiped House's vehicle, and that he had not approached House's vehicle with his hands in his pockets shouting "I am a police officer" after they had pulled off of the interstate. McFarland also testified that House had not disclosed in his report that House had activated his emergency lights, that House had attempted to conduct a traffic stop of McFarland, or that House slammed his brakes in front of McFarland.

Reginald Thompson testified that, on April 15, 2009, he turned right from a business parking lot onto a four lane road after checking to make sure that there was no oncoming traffic and that he could pull out safely. He initially turned into an acceleration lane, where he "got up to speed," and then merged into the right lane, traveling at a speed of 41 or 42 miles per hour in a 45 mile per hour zone.

23

After checking his mirrors and noting that the traffic in the left lane was "a good distance back," he merged into the left lane, at which point House began approaching quickly from Thompson's rear in a law enforcement vehicle. House honked his horn at Thompson and passed Thompson on the right, traveling faster than the speed limit. A short while later, Thompson stopped behind House at a red light. When the light turned green, House continued driving with Thompson behind him through several intersections until they reached an area where the traffic thinned, and then House abruptly reduced his speed, forcing Thompson to pull over on the side of the road. House then parked his vehicle in front of Thompson's vehicle at an angle, blocking him in. Thompson did not believe he was free to leave because he could see from House's uniform that House was a police officer, House's vehicle was parked so as to prevent Thompson from driving his vehicle back onto the road, and House had a gun.

House approached Thompson's vehicle, appeared "very angry," and told Thompson that he had summoned local law enforcement. Despite Thompson's repeated inquiries, House refused to tell Thompson his name, the name of the agency that employed him, or why he had stopped Thompson. House directed Thompson to follow him to a nearby cemetery driveway where there was less traffic, and both men moved their vehicles. Thompson believed he had no choice

24

but to follow House because House was a police officer in a police vehicle. After they had been waiting in the cemetery driveway for seven or eight minutes, House directed Thompson to follow House to a restaurant parking lot to make way for a funeral procession, and Thompson complied. Local law enforcement officers arrived at the parking lot at the same time as House and Thompson, and they questioned House and Thompson. During the questioning, House accused Thompson of failing to yield the right of way, and Thompson replied, "you're right." Thompson "had not done anything wrong" and only told House that he was right because Thompson felt that he "couldn't win" with House, and he wanted to "pacify the situation" and "appease" House.

During the prosecutor's direct examination of Thompson, the prosecutor showed Thompson a copy of the incident report House had filed regarding House's encounter with Thompson, which the prosecutor had already submitted into evidence. House stated in the report that Thompson had cut across three lanes of traffic as he pulled out of a business parking lot onto the roadway and had entered House's lane, nearly striking House's vehicle; that he had passed Thompson's vehicle on the right and continued driving; that he had later pulled into a "business driveway" to call 911; and that Thompson had stopped of his own volition while House was on the phone with the 911 operator.

25

Thompson testified that this report was false. Thompson also testified that House failed to disclose in his report that House had forced Thompson to pull over, that House had directed Thompson to follow him into the cemetery driveway, or that House had directed Thompson to follow him from the cemetery driveway to the restaurant parking lot.

When the government rested its case, House moved for a judgment of acquittal on all counts. The district court denied the motion. House then called three witnesses.

John Beal, the Georgia law enforcement officer who had arrested Wibel on December 3, 2008, testified that he had not personally witnessed Wibel driving aggressively and that his only authority to stop Wibel had been based on a radio dispatch report initiated by House, advising all officers to be on the lookout for a possible aggressive driver in a vehicle matching the description of Wibel's vehicle. Beal explained that he had treated House's report as probable cause to stop Wibel because House was a law enforcement officer, and reports by law enforcement officers are treated differently than reports by private citizens. Beal also testified that he believed House's account of the encounter between House and Wibel because House was a law enforcement officer, and "generally a police officer is supposed to be held to a higher standard and give you the truth." Beal

26

stated that he had arrested Wibel based on House's account of events, House's suggestion that he was certified as a peace officer in Georgia, and House's insistence that Beal arrest Wibel.

House attempted to introduce testimony from two other witnesses. The first was a Georgia law enforcement officer who was prepared to testify regarding a traffic stop House had conducted but for which House was not indicted. The second was a lawyer licensed to practice in Georgia who was prepared to testify as to Georgia law regarding traffic stops and arrests. But the district court did not permit either witness to testify.

When House rested his case, the district court stated that all the evidence was closed. House did not renew his motion for a judgment of acquittal. Both the prosecutor and House then delivered their closing arguments to the jury.

During the prosecutor's closing argument, he remarked in reference to House's encounters with Padgett, "We don't have the defendant's version of that stop because there is no report about that one. The only evidence you have therefore is that I wasn't doing anything wrong but driving down the road in the left-hand lane and I got stopped for aggressive driving both times." House raised no objection to these statements.

House proposed several jury instructions. Among these were an instruction that an officer's subjective motivation for conducting a traffic stop is irrelevant in determining the reasonableness of the stop under the Fourth Amendment, an instruction that a traffic stop is reasonable if based on probable cause, an instruction that federal law permits a law enforcement officer to make warrantless arrests for minor criminal offenses committed in the officer's presence, an instruction that the reasonableness of a law enforcement officer's actions under the Fourth Amendment does not depend on the officer's compliance with local law or policy, an instruction that Georgia law permits a private citizen to arrest a motorist for a minor traffic violation, an instruction that Georgia law permits a law enforcement officer to arrest a motorist for a traffic offense made in the officer's presence, an instruction that Georgia law defines peace officer as "any person who by virtue of his office or public employment is vested by law with a duty to maintain public order or to make arrests for offenses, whether that duty extends to all crimes or is limited to specific offenses," and an instruction that no one may be held criminally responsible for an act unless the law gives fair warning that the act is proscribed. The district court rejected these proposed instructions.

28

In its charge to the jury, the district court explained that the jury must base its verdict on admissible evidence and that statements by the lawyers and the court during the trial were not admissible evidence:

> You make your decision in this case based upon the testimony and other evidence presented here during trial. You recall I told you when this case started that whatever decision you made had to be based upon the evidence presented in this courtroom and nothing else.
>
> . . . .
>
> As I stated to you earlier[,] you are to consider the evidence that has been admitted in this case. The term "evidence" includes the testimony of the witnesses, the exhibits admitted into the record, and any stipulation of fact made by counsel. Whatever the lawyers say is not evidence in the case. And it is your own recollection and interpretation of the evidence that controls. What the lawyers say is not binding on you. Also, you should not assume from anything I may have said during this trial [that] I have any opinion concerning any of the issues in this case. Except for my instructions to you on the law, you disregard anything I might have said during the trial in arriving at your decision concerning the facts of this case.

With regard to the requirements of the Fourth Amendment as to traffic stops, the district court instructed the jury that a traffic stop conducted by a law enforcement officer is constitutional only if the officer has both authority or jurisdiction and a sufficient legal basis for the stop. That is, the district court instructed the jury that a traffic stop conducted by a law enforcement officer is

29

unreasonable under the Fourth Amendment whenever the officer lacks authority or jurisdiction to conduct the stop:

> As to [sic] traffic stop itself, under the Fourth Amendment a law enforcement officer must have authority or jurisdiction and sufficient legal basis to make a traffic stop. Both facts must be present in order for the traffic stop to be lawful, and therefore, not a violation of the defendant's constitutional rights.
>
> If you find from the evidence in this case that the defendant did not have authority or jurisdiction as a federal police officer to make a traffic stop in Georgia, then you may find and you would be authorized to find the actions in doing so were unreasonable.

House objected to this instruction.

The district court instructed the jury that the legal basis required for a traffic stop under the Fourth Amendment was "a reasonable and articulable suspicion" that the motorist had committed a traffic violation. The district court described "a reasonable and articulable suspicion" as "less than probable cause," but "more than just a hunch because the Fourth Amendment requires at a minimum some objective justification for the traffic stop." The district court also instructed the jury, "In determining whether there was probable cause or reasonable suspicion, you must rely only on the facts known to the defendant before the stop was made."

Then the district court explained that, if they found a traffic stop was "lawful" initially, the jury must also determine whether the detention following the stop was "reasonable and therefore lawful":

30

> . . . [A] valid traffic stop can in some circumstances turn into an unreasonable and therefore unlawful detention of the motorists. There is no bright line test to determine whether a lawful traffic stop has become unlawful detention. A police officer may detain a motorist for a reasonable period for the police officer to conduct the necessary investigation to determine what action he will take. In general, a police officer may detain a motorist long enough to allow the officer to write a traffic ticket and check into the motorist's background to see if there are any warrants and so forth outstanding. In determining whether a traffic stop has become so intrusive that the detention is no longer reasonable, you may consider factors such as the public interest served by the seizure, the nature and scope of the intrusion, [and] the objective facts relied upon by the officer in making the stop and detaining the motorist.

House objected to this instruction on the ground that the "balancing test" the district court described is no longer good law as applied to traffic stops initially supported by probable cause.

The district court instructed the jury that a defendant must act "willfully" in effecting a deprivation of civil rights for that deprivation to constitute a violation of section 242, but that a deprivation may be "willful" even if the defendant was not thinking in legal or constitutional terms:

> . . . [A]n act is done willfully if it is done voluntarily and deliberately and with the specific intent to do something the law forbids. That is with bad purpose to disobey or disregard the law. Although the government must prove beyond a reasonable doubt that the defendant voluntarily and deliberately did an act that deprived a motorist of a protected right, it is not necessary for the government to prove the defendant was thinking in legal or constitutional terms. You [m]ay find the defendant acted with the required intent, even if you find he had no real familiarity with the constitution or with the particular

31

constitutional rights involved. You must, however, find the defendant intended to do something that the constitution forbids.

. . . .

If you find the defendant knew what he was doing and that he intended to do such an act, and if you find what he did constituted a deprivation of a constitutional right and you so find beyond a reasonable doubt, then you may conclude that he acted willfully.

House did not object to this instruction.

With regard to the violations of section 1001 for making false statements with which House was charged, the district court instructed the jury that "the Federal Protective Service is a department or agency of the United States, and the filing of reports or documents with the agency is a matter within the jurisdiction of the agency." House did not object to this instruction.

When the jury left the courtroom following the jury charge, the prosecutor informed the district court that it had failed to instruct the jury that they were not permitted to draw an adverse inference from House's failure to testify in his own defense. The district court offered to call the jury back into the courtroom and provide this instruction to them, but House declined the offer and stated, "We are fine as it is. We don't ask that you bring them back."

The jury found House guilty of all twelve counts. The district court sentenced House to eighteen months of imprisonment for each count, to be served

concurrently, followed by three years of supervised release for each count, to be served concurrently. The district court also ordered House to pay a fine of $10,000. House was released on bond pending appeal.

## II. STANDARDS OF REVIEW

Several standards govern our review of this appeal. "We review challenges to the sufficiency of the evidence de novo," and ask "whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Mercer, 541 F.3d 1070, 1074 (11th Cir. 2008). But where a defendant "present[s] his case after denial of a motion for judgment of acquittal" and then "fails to renew his motion for judgment of acquittal at the end of all of the evidence," we review the defendant's challenge to the sufficiency of the evidence for a manifest miscarriage of justice. United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994). This standard requires us to affirm the defendant's conviction unless "the evidence on a key element of the offense is so tenuous that [the] conviction [is] shocking." United States v. Milkintas, 470 F.3d 1339, 1343 (11th Cir. 2006). "In making this determination, we must view the evidence in the light most favorable to the government and accept all reasonable inferences and credibility determinations that support the jury's verdict." Id.

We review jury instructions challenged in the district court "de novo to determine whether the instructions misstated the law or misled the jury to the prejudice of the objecting party." United States v. Felts, 579 F.3d 1341, 1342 (11th Cir. 2009). In contrast, jury instructions that are challenged for the first time on appeal are reviewed for plain error." Id. at 1343. We review the failure to give a requested jury instruction for abuse of discretion, which occurs only where the requested instruction "(1) was correct, (2) was not substantially covered by a charge actually given, and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." United States v. Dohan, 508 F.3d 989, 993 (11th Cir. 2007). Where a party expressly accepts a jury instruction, "such action constitutes invited error" and "serve[s] to waive [his] right to challenge the accepted instruction on appeal." United States v. Silvestri, 409 F.3d 1311, 1337 (11th Cir. 2005). We will not reverse a defendant's conviction based on a challenge to the jury charge unless we are "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." Felts, 579 F.3d at 1343; Dohan, 508 F.3d at 993. "Jury instructions are subject to harmless error review." United States v. Webb, 655 F.3d 1238, 1249 n.8 (11th Cir. 2011). An error is harmless if the reviewing court is satisfied "beyond a reasonable doubt that

34

the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967).

"We review a district judge's conduct during trial for abuse of discretion." United States v. Verbitskaya, 406 F.3d 1324, 1337 (11th Cir. 2005). But where a defendant "raises [an] issue for the first time on appeal, we review it only for plain error." United States v. McNair, 605 F.3d 1152, 1222 (11th Cir. 2010). "We may not correct an error the appellant failed to raise in the district court unless there is: (1) error, (2) that is plain, and (3) that affects substantial rights." Id. (internal quotation marks omitted). "If the preceding three conditions are met, we may exercise discretion to correct a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotation marks omitted). We also apply the plain error standard when we review the failure to give a curative instruction sua sponte. United States v. Thigpen, 4 F.3d 1573, 1579 (11th Cir. 1993).

"We review a district court's evidentiary rulings for clear abuse of discretion." United States v. Perez-Oliveros, 479 F.3d 779, 783 (11th Cir. 2007). "An abuse of discretion occurs if the district court applies an incorrect legal standard or makes findings of fact that are clearly erroneous." United States v. Wilk, 572 F.3d 1229, 1234 (11th Cir. 2009). "Even where an abuse of discretion

35

is shown, nonconstitutional evidentiary errors are not grounds for reversal absent a reasonable likelihood that the defendant's substantial rights were affected." United States v. Sellers, 906 F.2d 597, 601 (11th Cir. 1990). That is, we will not reverse a defendant's conviction on the basis of an evidentiary error that does not implicate his constitutional rights "if the error had no substantial influence, and enough evidence supports the result apart from the phase affected by error." United States v. Stout, 667 F.2d 1347, 1352 (11th Cir. 1982).

We review claims of prosecutorial misconduct de novo. United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006). But where a defendant fails to make a contemporaneous objection to the alleged misconduct in the district court, we review such claims for plain error. United States v. Newton, 44 F.3d 913, 920 (11th Cir. 1995).

When we address a claim of cumulative error, we consider "all errors preserved for appeal and all plain errors" in the context of "the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." United States v. Ladson, 643 F.3d 1335, 1342 (11th Cir. 2011). "The total effect of the errors on the trial will depend, among other things, on the nature and number of the errors committed; their interrelationship, if any, and combined effect; . . . the

strength of the government's case, and the length of trial." <u>United States v. Baker</u>,

432 F.3d 1189, 1223 (11th Cir. 2005) (internal quotation marks omitted).

### III. DISCUSSION

House raises seven arguments on appeal.  First, he argues that the record does not contain sufficient evidence to support his convictions.  Second, he argues that the district court erred in instructing the jury.  Third, he argues that the district court improperly interjected itself into the trial.  Fourth, he argues that the district court improperly excluded evidence.  Fifth, he argues that the prosecutor improperly commented on House's decision not to testify.  Sixth, he argues in his reply brief that his counsel was ineffective.  Seventh, he argues that the cumulative effect of the errors deprived him of a fair trial.  We address each argument in turn.

*A.  Sufficient Evidence Supports House's Convictions.*

House argues that the government presented insufficient evidence to support his eight convictions for willful unreasonable seizures and his four convictions for making false statements.  We conclude that the evidence, viewed in the light most favorable to the government, establishes that no manifest miscarriage of justice occurred.

We discuss this evidence in two parts.  First, we address the evidence that supports House's convictions for willful unreasonable seizures.  Second, we

37

address the evidence that supports House's convictions for making false statements.

### 1. Convictions for Willful Unreasonable Seizures

House argues that there was insufficient evidence to support his convictions for the willful violations of the Fourth Amendment charged in counts one, two, three, four, six, seven, nine, or eleven. He contends that he had authority to effect the seizures as an agent of the government and that the seizures were reasonable under the Fourth Amendment. House argues that he had probable cause for the seizures charged in counts two, three, and nine because the motorists identified in those counts admitted that they were speeding and that he had probable cause for the seizures charged in counts one, six, seven, and eleven because the motorists identified in those counts admitted to driving in a manner that could be considered unsafe. House also maintains that we must reverse his convictions on counts six, seven, nine, and eleven because he was not responsible for the seizures identified in those counts. House contends alternatively that, if he was not permitted to effect the charged seizures as an agent of the government, then his actions could not have implicated the Fourth Amendment.

Although we conclude that sufficient evidence supports all eight of House's convictions under section 242, we need not discuss House's convictions on counts

38

one, two, three, or six.  We must vacate those four convictions on another ground, which we address in Section B.  House's convictions do not represent a manifest injustice.

To prove a violation of section 242, the government had to present evidence that House acted "(1) willfully and (2) under color of law (3) to deprive a person of rights protected by the Constitution or laws of the United States."  United States v. Lanier, 520 U.S. 259, 264, 117 S. Ct. 1219, 1224 (1997) (internal quotation marks omitted).  The federal right that House allegedly violated is the right under the Fourth Amendment to be free from unreasonable seizures.  See U.S. CONST., amend. IV.  To establish a deprivation of that right, the government must prove that a seizure occurred, that the seizure was unreasonable, and that the seizure constituted "governmental action"—that is, that the individual who effected the seizure was "acting as an agent of the Government or with the participation or knowledge of any governmental official," see United States v. Jacobsen, 466 U.S. 109, 113, 104 S. Ct. 1652, 1656 (1984) (internal quotation marks omitted).  Conduct "under color of law" satisfies the requirement of governmental action.  Cf. Lugar v. Edmondson Oil Co., 457 U.S. 922, 928–29 & n.9, 102 S. Ct. 2744, 2749 & n.9 (1982).

"[A] person is 'seized' . . . when, by means of physical force or a show of authority, his freedom of movement is restrained" such that, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 553–54, 100 S. Ct. 1870, 1877 (1980). A seizure is effected by force "when there is a governmental termination of freedom of movement through means intentionally applied[,]" such as where a law enforcement officer pulls his vehicle "alongside [a] fleeing car and sideswipe[s] it, producing [a] crash" regardless of whether the officer intends "to give the oncoming driver the option of a voluntary stop" or "to produce a collision." Brower v. County of Inyo, 489 U.S. 593, 597–99, 109 S. Ct. 1378, 1381–82 (1989). A seizure by means of show of authority requires both a show of authority and submission to that authority. California v. Hodari D., 499 U.S. 621, 628–29, 111 S. Ct. 1547, 1551–52 (1991). That is, a government officer effects a seizure by means of a show of authority where "the officer's words and actions would have conveyed . . . to a reasonable person" that "he was being ordered to restrict his movement," and those words and actions actually "produce his stop." Id. Certain "circumstances . . . might indicate a seizure, even where the person did not attempt to leave," including "the display of a weapon by an officer . . . or the use of language or tone of voice indicating

40

that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554, 100 S. Ct. at 1877. An arrest is the "quintessential" example of a seizure of the person. Hodari D., 499 U.S. at 624, 111 S. Ct. at 1550. In addition, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Wren, 517 U.S. at 809–10, 116 S. Ct. at 1772.

A traffic stop constitutes an unreasonable seizure if it is not supported by reasonable suspicion or probable cause. Id. at 810, 116 S. Ct. at 1772; United States v. Chanthasouxat, 342 F.3d 1271, 1275 (11th Cir. 2003). But a traffic stop is reasonable under the Fourth Amendment when supported by probable cause or reasonable suspicion even if it is inconsistent with agency policy, see Wren, 517 U.S. at 813–16, 116 S. Ct. at 1774–76, or state law, see Moore, 553 U.S. at 173–76, 128 S. Ct. at 1605–07. Probable cause requires that "the facts and circumstances within [an officer's] knowledge and of which [the officer] ha[s] reasonably trustworthy information [be] sufficient to warrant a prudent man in believing" that the person seized is guilty of a crime. Beck v. Ohio, 379 U.S. 89, 91, 85 S. Ct. 223, 225 (1964). Reasonable suspicion requires "some minimal level of objective justification," meaning "something more than an inchoate and

unparticularized suspicion or hunch," that the person seized is guilty of a crime. United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989) (internal quotation marks omitted). If the scope of the traffic stop exceeds that of "an investigative stop of limited duration," it constitutes an unreasonable seizure unless it is supported by probable cause. United States v. Acosta, 363 F.3d 1141, 1145–46 (11th Cir. 2004).

A person acts "willfully" for purposes of section 242 when he acts with "a specific intent to deprive a person of a federal right made definite by decision or other rule of law," or "in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite." Screws v. United States, 325 U.S. 91, 103, 105, 65 S. Ct. 1031, 1036–37 (1945). This Court has recognized that a series of individual actions that "support an innocent explanation," when "viewed in a vacuum," may in combination provide sufficient evidence for a reasonable juror to infer a defendant's intent. United States v. Harris, 20 F.3d 445, 453 (11th Cir. 1994). We have also explained that, in making findings of a defendant's intent, the defendant's "subsequent conduct may be considered if it supports a reasonable inference as to [his] prior intent." United States v. McCarrick, 294 F.3d 1286, 1291 (11th Cir. 2002).

An act is effected "under color of law" for purposes of section 242 if it is effected by a law enforcement officer acting "under pretense of law." Screws, 325 U.S. at 111, 65 S. Ct. at 1040 (internal quotation marks omitted). "Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it." Id.; see also United States v. Classic, 313 U.S. 299, 326, 61 S. Ct. 1031, 1043 (1941) ("Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law."). Thus, a law enforcement officer acts under color of law "when he acts with authority possessed by virtue of his employment" with the government, Almand v. DeKalb County, 103 F.3d 1510, 1513 (11th Cir. 1997), or "the manner of his conduct . . . makes clear that he was asserting the authority granted him and not acting in the role of a private person." Williams v. United States, 341 U.S. 97, 100, 71 S. Ct. 576, 578 (1951) (holding that a jury could find that a private detective who was qualified as a special police officer had acted under color of law when he flashed his badge while committing a series of assaults).

a. Evidence of the Seizures

The government offered sufficient evidence to establish that House seized the motorists during the encounters identified in counts four, seven, nine, and

43

eleven.  Every encounter involved a show of authority by House, and every encounter involved submission to that show of authority.

Regarding the encounter identified in count four, Rivas testified that House appeared to be wearing "some kind of uniform" when he pulled beside Rivas; that House told Rivas to "pull over"; that House activated his emergency lights; that Rivas pulled over because that was "what any law-abiding citizen would do when they see blue lights"; and that after Rivas pulled over, House spoke to Rivas using a "very scary" tone of voice and told Rivas that House was a federal officer and "was going to get [Rivas] for destruction of government property."  This testimony entitled the jury to find that House seized Rivas, either by conducting a traffic stop of Rivas, see Whren, 517 U.S. at 809–10, 116 S. Ct. at 1772, or by detaining Rivas on the side of the road through the use of words and actions that would indicate to a reasonable person that he was not free to leave, see Mendenhall, 446 U.S. at 553–54, 100 S. Ct. at 1877.

Regarding the encounter identified in count seven, Wibel testified on direct examination that he pulled over his vehicle "based on getting stopped by . . . two vehicles" after House and Beal had activated the emergency lights on their respective vehicles.  This testimony entitled the jury to find that House seized Wibel by participating in a traffic stop of Wibel.  See Whren, 517 U.S. at 809–10,

44

116 S. Ct. at 1772. The jury was entitled to credit this testimony and not the testimony of Wibel on cross-examination that suggested Beal's actions alone caused Wibel to stop. See Rixey v. W. Paces Ferry Hosp., Inc., 916 F.2d 608, 616 (11th Cir. 1990) ("A jury is not required to accept 'all or none' of a witness's testimony . . . .").

In addition, Beal, the local law enforcement officer who participated in the seizure of Wibel, testified that he did not personally witness Wibel driving aggressively, that his only basis for stopping Wibel was House's radio dispatch report, that he had treated House's report as probable cause to stop Wibel because House was a law enforcement officer, and reports by law enforcement officers are treated differently than reports by private citizens. Beal also testified that he had arrested Wibel based on House's account of events and House's insistence that Wibel be arrested. Beal believed House's account of events because House was a law enforcement officer, and "generally a police officer is supposed to be held to a higher standard and give you the truth." Beal's testimony provided sufficient evidence for the jury to find that House effected the seizure of Wibel through a show of his authority as a law enforcement officer, at the time of Wibel's stop or his arrest. Cf. Franks v. Delaware, 438 U.S. 154, 156, 98 S. Ct. 2674, 276 (1978) (holding that a false or misleading statement in a warrant affidavit may constitute a

45

violation of the Fourth Amendment if the statement is "necessary to the finding of probable cause" required for the issuance of a warrant).

Regarding the encounter identified in count nine, McFarland testified that House was driving a marked law enforcement vehicle, that House activated his emergency lights, and that House escorted McFarland to the side of the road in a manner suggesting that House intended to conduct a traffic stop of McFarland. This testimony entitled the jury to find that House seized McFarland. That House abandoned his course of action before McFarland brought his vehicle to a complete stop is irrelevant because any "meaningful interference, however brief, with an individual's freedom of movement" constitutes a seizure. Jacobsen, 466 U.S. at 113 n.5, 104 S. Ct. at 1656 n.5.

Regarding the encounter identified in count eleven, Thompson testified that House maneuvered his government vehicle so as to force Thompson off the road and then blocked Thompson's route back onto the road; that once Thompson had stopped his vehicle on the side of the road, House approached Thompson's vehicle with a "very angry" demeanor, wearing a police uniform and a gun, and walked around to the rear of Thompson's vehicle and recorded Thompson's license plate number; that House later instructed Thompson to move his vehicle from the location where he had initially stopped it to a cemetery driveway and later to a

46

restaurant parking lot; and that Thompson moved his vehicle "because [House] told [him] to." This testimony entitled the jury to find that House seized Thompson, either by forcing Thompson off the road, cf. Brower, 489 U.S. at 597–99, 109 S. Ct. at 1381–82, or by detaining Thompson after Thompson stopped his vehicle, see Mendenhall, 446 U.S. at 553–54, 100 S. Ct. at 1877.

b. Evidence that the Seizures Were Unreasonable

The government also offered sufficient evidence to establish that the seizures charged in counts four, seven, nine, and eleven were unreasonable. Rivas, Wibel, and Thompson each testified that they had not violated any traffic laws. This testimony entitled the jury to find that House had neither probable cause nor reasonable suspicion to support his seizures of those three motorists, which would mean that those seizures were unreasonable, Chanthasouxat, 342 F.3d at 1275.

Although McFarland testified that he was driving above the speed limit when he first saw House's vehicle ahead of him, McFarland's testimony is far from conclusive evidence of the facts known to House when he seized McFarland, see Beck, 379 U.S. at 91, 85 S. Ct. at 225. Because McFarland testified that he slowed before he caught up to House, the jury could reasonably have found that House would have been unable to tell McFarland was speeding before the seizure

and that House had neither probable cause nor reasonable suspicion to support his seizure of McFarland. If the jury so found, it would mean that the seizure was unreasonable, Chanthasouxat, 342 F.3d at 1275.

### c. Evidence that House Acted Willfully

The government also offered sufficient evidence to establish that House acted "willfully" when he effected the seizures charged in counts four, seven, nine, and eleven. The right of motorists to be free from unreasonable seizures is "specific and definite": it is defined "by the express terms of the Constitution" and has been "made specific" by Supreme Court "decision[s] interpreting the Constitution," so that those who violate that right "are in no position to say that they had no adequate advance notice that they would be visited with punishment." Screws, 325 U.S. at 105, 65 S. Ct. at 1037; see Whren, 517 U.S. at 809–10, 116 S. Ct. at 1772 (explaining that a traffic stop is a seizure); Sokolow, 490 U.S. at 7, 109 S. Ct. at 1585 (discussing requirement of reasonable suspicion); Beck, 379 U.S. at 91, 85 S. Ct. at 225 (discussing requirement of probable cause). The testimony of Rivas, Wibel, McFarland, and Thompson established a pattern of conduct by House in which he repeatedly seized motorists without regard for the requirements of the Fourth Amendment and then attempted to conceal his actions by making false statements in his incident reports. Padgett's, Caravalho's, and Kinnamont's

48

testimony suggests that House's behavior during their encounters with him fit into this same pattern. The sheer number of unreasonable seizures that House effected, as well as his efforts to prevent his superiors' detection of his actions, entitled the jury to infer that House acted willfully when he effected the seizures charged in counts four, seven, nine, and eleven. McCarrick, 294 F.3d at 1291; Harris, 20 F.3d at 453.

### d. Evidence that House Acted Under Color of Law

Finally, the government offered sufficient evidence to establish that House acted "under color of law" when he effected the seizures charged in counts four, seven, nine, and eleven. Rivas testified that House activated his emergency lights as he told Rivas to pull over, that House was wearing his uniform when he stopped Rivas, and that House identified himself to Rivas as a federal officer during the stop. Wibel testified that House activated his emergency lights as he and Beal pulled Wibel over to the side of the road. McFarland testified that House was driving a law enforcement vehicle and that House activated his emergency lights as he seized McFarland. Thompson testified that House was driving a law enforcement vehicle, and that House was wearing his uniform as he seized Thompson. Rivas's, Wibel's, McFarland's and Thompson's testimony entitled the jury to find that House was acting under color of law when he seized each of those

four motorists.  See Classic, 313 U.S. at 326, 61 S. Ct. at 1043.  To the extent that House effected the seizure of Wibel through Beal, Beal's testimony entitled the jury to find that House effected this seizure under color of law.  Cf. Almand, 103 F.3d at 1514–15 (explaining that a law enforcement officer is probably acting under color of law when he uses "his status as a police officer" to induce another to act).  That House may have overstepped his authority in effecting the seizures is no defense for his conduct.  Cf. Screws, 325 U.S. at 111, 65 S. Ct. at 1040; Almand, 103 F.3d at 1513.

## 2.  Convictions for Making False Statements

House argues that no reasonable jury would have convicted him on counts five, eight, or twelve because the reports charged in those counts were consistent with his contemporaneous, oral accounts of the relevant seizures, and "no reasonable jury would have believed [he] [made] up facts as they were happening and then remembered his fictitious story and made up the same facts as he later prepared a report."  House also argues that there was insufficient evidence to support his convictions for the violations of section 1001 charged in counts five, eight, ten, and twelve because any false statements in the incident reports he submitted were not material.  House maintains that the statements in the reports were material only to establish that he had  "proper cause" for the seizures

50

described in the reports, and because each of those seizures were based on probable cause, "any purported misstatement as to the other facts in the reports was not material." We disagree.

To convict House under section 1001, the government had to prove "(1) that a statement was made; (2) that it was false; (3) that it was material; (4) that it was made with specific intent; and (5) that it was within the jurisdiction of an agency of the United States." United States v. Boffil-Rivera, 607 F.3d 736, 740 (11th Cir. 2010) (internal quotation marks omitted). The false statement may take the form of an affirmative misrepresentation or the concealment of a material fact. Id. "Falsity through concealment exists where disclosure of the concealed information is required by a statute, government regulation, or form." United States v. Calhoon, 97 F.3d 518, 526 (11th Cir. 1996). A false statement is material if it "ha[s] a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed"; proof of actual influence is not required. Boffil-Rivera, 607 F.3d at 741 (internal quotation marks and alteration omitted). The specific intent required is the "intent to deceive by making a false or fraudulent statement." United States v. Dothard, 666 F.2d 498, 503 (11th Cir. 1982). An agency's jurisdiction encompasses "all matters confided to the authority of an agency or department," and jurisdiction requires only that the

51

agency possess "power to exercise authority in a particular situation." United States v. Rodgers, 466 U.S. 475, 479, 104 S. Ct. 1942, 1946 (1984).

### a. Evidence that House Made False Statements

The government produced sufficient evidence that House made the statements charged in counts five, eight, ten and twelve and that the statements were false. The government established that House made the statements in the incident reports describing House's encounters with Rivas, Wibel, McFarland, and Thompson. House's name appears on each of the reports as the filing officer, and House disputes neither his submission of the reports nor his responsibility for the statements in the reports. The government established the existence of affirmative misrepresentations and omissions in each of the reports through the testimony of Rivas, Wibel, McFarland, and Thompson, each of whom testified that the reports provided false accounts of their encounters with House. House offers no support for the proposition that no jury could reasonably believe a defendant can lie consistently. In any event, there is nothing to suggest that the testimony of Rivas, Wibel, McFarland, and Thompson is "incredible as a matter of law." See United States v. Hewitt, 663 F.2d 1381, 1386 (11th Cir. 1981).

### b. Evidence that the False Statements Were Material

The government established the materiality of the false statements charged in counts five, eight, ten, and twelve through the testimony of Andrews and Dingman. Andrews testified that Federal Protective Service supervisors use these reports to determine whether the officers' conduct was authorized and because other law enforcement agents sometimes use the reports in connection with criminal prosecutions. Andrews explained that, for a report to be useful for either of these purposes, an officer must provide truthful information as to all of the facts and circumstances surrounding the events documented in the report. Dingman offered similar testimony that an officer's provision of "a true and accurate factual account" of events in each police report he files is "material to his duties as a federal police officer." He testified that the government uses the reports in deciding whether to initiate criminal prosecutions, that it was "very important" that a report include truthful information in relation to "all of the facts of the case, the who, what, when, where, and how of the case," and that false statements in a report could ruin any case the government attempts to pursue based upon events described in that report. Andrews's and Dingman's testimony refutes House's argument that not all of the statements in the reports were material.

c. Evidence that House Acted with Specific Intent to Deceive

53

The government also presented sufficient evidence that House had the intent to deceive when he made the false statements charged in counts five, eight, ten, and twelve. Because "[s]pecific intent to defraud can be difficult to prove," United States v. Ethridge, 948 F.2d 1215, 1217 (11th Cir. 1991), "[w]e have held that § 1001 convictions challenged on sufficiency of the evidence grounds can be affirmed based on a finding that a jury reasonably could infer from circumstantial evidence that the defendants acted knowingly and willfully," United States v. Gafyczk, 847 F.2d 685, 692 (11th Cir. 1988); see also McCarrick, 294 F.3d at 1291; United States v. Hernando Ospina, 798 F.2d 1570, 1581 (11th Cir. 1986). Circumstantial evidence supports that inference here. Andrews, Glynn, Reed, and Dingman testified that the policy of the Federal Protective Service prohibited traffic stops for minor traffic violations outside of federal property, House was familiar with that policy, House had been reprimanded repeatedly and subjected to an internal agency investigation for violations of the policy, and House's vehicular privileges had been temporarily suspended as a result of the internal investigation. Andrews and Dingman testified that House was required to file an incident report each time he activated his emergency lights or conducted a traffic stop and that House's supervisors used those reports to determine whether his actions were permitted. Based on the testimony of Rivas, Wibel, McFarland, and Thompson,

54

the encounters House reported violated agency policy. The jury could reasonably have inferred that House made false statements in the incident reports with the specific intent to deceive his supervisors to avoid further discipline for violations of agency policy.

d. Evidence that the Statements Were Within the Jurisdiction of a Federal Agency

Finally, the false statements charged in counts five, eight, ten, and twelve were within the jurisdiction of a federal agency. House's reports of his encounters with Rivas, Wibel, McFarland, and Thompson were "matters confided to the authority of" the Federal Protective Service, over which the agency possessed "power to exercise authority." Rodgers, 466 U.S. at 479, 104 S. Ct. at 1946. We have explained that "[s]ection 1001 is necessarily couched in very broad terms to encompass the variety of deceptive practices which ingenious individuals might perpetrate upon an increasingly complex government" and held that, where a federal agency commonly uses an official form "in the performance of its regularly conducted activities," the submission of a completed form to that agency satisfies the jurisdictional requirement of section 1001. Gafyczk, 847 F.2d at 690–91 (internal quotation marks and alteration omitted). Testimony by Andrews and Dingman established that the Federal Protective Service and other federal law

enforcement agencies used the incident reports in the performance of their regular activities. Cf. id. at 691.

*B. The District Court Erred when It Instructed that a Seizure Effected Without Jurisdiction or Authority Violates the Fourth Amendment, but the District Court Did Not Otherwise Err in its Jury Charge.*

We divide our discussion of House's arguments about the jury instructions into two parts. First, we address House's challenges to four instructions included in the jury charge. Second, we address House's challenges to the omission of five instructions from the jury charge.

### 1. Instructions Included in the Jury Charge

On appeal, House challenges four instructions included in the jury charge. First, House argues that the district court erred when it instructed the jury that a traffic stop is unreasonable under the Fourth Amendment whenever effected by a law enforcement officer without jurisdiction or authority. Second, House maintains that the district court erred when it instructed the jury that an initially valid traffic stop could develop into an unreasonable detention without distinguishing between stops based on reasonable suspicion and stops based on probable cause. Third, House argues that the district court plainly erred when it instructed the jury on the definition of "willfully" under section 242 because its instructions failed to explain that House must have acted without probable cause

56

and not merely contrary to agency policy to have violated section 242. Fourth, House argues that the district court plainly erred when it instructed the jury that the statements in the incident reports he submitted to the Federal Protective Service concerned a "matter within the jurisdiction of" a federal agency under section 1001. We agree that the district court erred when it instructed the jury that a traffic stop effected without jurisdiction or authority is unreasonable under the Fourth Amendment, but conclude that House's other arguments fail.

The district court misstated the law when it instructed the jury that a traffic stop is unreasonable under the Fourth Amendment if it is effected without jurisdiction or authority. The Supreme Court has held that a traffic stop is reasonable under the Fourth Amendment when supported by probable cause or reasonable suspicion even if it is inconsistent with agency policy, see Whren, 517 U.S. at 813–16, 116 S. Ct. at 1774–76, or state law, see Moore, 553 U.S. at 173–76, 128 S. Ct. at 1605–07. See also Chanthasouxat, 342 F.3d at 1275. The instruction by the district court allowed the jury to convict House for the unreasonable seizures charged in counts one, two, three, four, six, seven, nine, and eleven if they found that House lacked either (1) probable cause or reasonable suspicion, or (2) jurisdiction or authority to effect the seizures charged in those

counts. That is, the district court instructed the jury that House could be convicted even if they found that he had probable cause or reasonable suspicion.

This error in the jury charge requires reversal of House's convictions on counts one, two, three, and six, but it was harmless with respect to his remaining convictions for willful unreasonable seizures. The government presented evidence that House lacked authority or jurisdiction to effect the seizures with which he had been charged, and House's convictions for willful unreasonable seizures, standing alone, do not tell us whether the jury found that House lacked probable cause or reasonable suspicion for the seizures underlying those convictions. But his convictions on counts four, seven, nine, and eleven do not stand alone; they stand together with his convictions for making false statements. The jury found House guilty of making false statements in the incident reports where he described the seizures charged in counts four, seven, nine, and eleven, which means that the jury credited the motorists' accounts of those seizures and discredited House's accounts of those seizures. The finding that House's reports were false necessarily means that House lacked probable cause or reasonable suspicion for those seizures. Because of this finding, the erroneous jury instruction could not have contributed to the jury's verdict with respect to counts four, seven, nine, and

eleven, and we conclude that the error was harmless as to those four counts.  See

Chapman, 386 U.S. at 24, 87 S. Ct. at 828.

We need not decide whether the district court erred when it instructed the

jury that an initially valid traffic stop could develop into an unreasonable

detention, because that error is harmless as to House's remaining convictions for

willful unreasonable seizures.  The jury found that the seizures charged in counts

four, seven, nine, and eleven were not supported by probable cause or reasonable

suspicion so the jury would have had no occasion to apply the instruction in its

consideration of those seizures.  The instruction could not have contributed to the

jury's verdict with respect to any of those four counts.  See Chapman, 386 U.S. at

24, 87 S. Ct. at 828.

The district court did not err, plainly or otherwise, when it instructed the

jury about the definition of "willfully" under section 242 or when it instructed the

jury that the statements in the incident reports House submitted to the Federal

Protective Service were matters within the jurisdiction of a federal agency.  The

definition of "willfully" in the jury charge was consistent with the definition of

that term provided by the Supreme Court in Screws, 325 U.S. at 101–07, 65 S. Ct.

at 1035–38.  If the instructions did not make clear that House must have acted

without probable cause and not merely contrary to agency policy to have violated

59

section 242, that lack of clarity was due to the erroneous definition of unreasonableness under the Fourth Amendment. The district court correctly instructed the jury that the statements in the incident reports House submitted to the Federal Protective Service concerned a "matter within the jurisdiction of" a federal agency under section 1001 because the Federal Protective Service is a federal agency that uses incident reports filed by its officers in its regular course of business. Where a federal agency uses a form in its regular course of business, the information provided on that form is a matter within the jurisdiction of the federal agency. See Gafyczk, 847 F.2d at 690–91.

## 2. Instructions Omitted from the Jury Charge

House also challenges the omission of four instructions from the jury charge. First, House argues that the district court abused its discretion when it failed to instruct the jury that the Fourth Amendment permits arrests for minor traffic violations committed in a law enforcement officer's presence. Second, House argues that the district court abused its discretion when it failed to instruct the jury that House could not be convicted of violating section 242 unless he had fair warning that his conduct was unlawful. Third, House argues that the district court abused its discretion when it failed to instruct the jury that a law enforcement officer's subjective intent is irrelevant to the reasonableness of a traffic stop under

60

the Fourth Amendment. Fourth, House argues that the district court abused its discretion when it failed to instruct the jury that the reasonableness of a traffic stop under the Fourth Amendment is not dependent upon state law or local agency policy. Fifth, House argues that the district court abused its discretion when it failed to instruct the jury that Georgia law permits citizens' arrests for minor traffic violations. None of these omissions warrants reversal of House's convictions for counts four, five, seven, eight, nine, ten, eleven, or twelve.

The district court did not abuse its discretion when it refused to instruct the jury on the issue of fair warning. "[T]he issue of whether a [law] is void for vagueness is a question of law for the court to determine," which means that "defendants [are] not entitled to a 'fair warning' instruction to the jury." United States v. Paradies, 98 F.3d 1266, 1284 (11th Cir. 1996).

The remaining four omissions from the jury charge, even if erroneous, were harmless. Because the jury found that the seizures charged in counts four, seven, nine, and eleven were not supported by probable cause or reasonable suspicion, it would have been irrelevant to the jury's consideration of those seizures that the Fourth Amendment permits arrests for minor traffic violations, that a law enforcement officer's subjective intent is irrelevant to the reasonableness of a traffic stop under the Fourth Amendment, that the reasonableness of a traffic stop

61

under the Fourth Amendment is not dependent upon state law or local agency policy, and that Georgia law permits citizens' arrests for minor traffic violations. Nor were any of those instructions relevant to the jury's consideration of the violations of section 1001 charged in counts five, eight, ten, and twelve. The omission of those instructions could not have contributed to the jury's verdict with respect to any of the remaining eight counts. See Chapman, 386 U.S. at 24, 87 S. Ct. at 828.

### C. The District Court Did Not Err in Its Management of the Trial.

House argues that the district court inappropriately interjected itself into the trial twice. First, House maintains that the district court reinforced an incorrect statement of law by the prosecutor. Second, House contends that the district court directed the government as to how best to prove its case. We address each of these arguments in turn.

### 1. Comment Regarding Legality of Seizure with Probable Cause

House maintains that the prosecutor incorrectly stated the law when he asked Reed, "If [Federal Protective Service officers] have probable cause to make a traffic stop, they are violating the civil rights of the motorists?" House argues that the district court reinforced that incorrect statement of law when House objected to the question on the basis that it was "not true," and the district court

62

responded, "It is too. It's got some if's and and's to it. We are getting to the if part. I think you are farafield [sic]." House also argues that the prosecutor reinforced the incorrect statement of law again when, shortly after the district judge's statement, the prosecutor asked Reed, "If [Federal Protective Service officers] have probable cause and they do detain the individual, they have done something unlawful?" According to House, the reinforcement of the incorrect statement of law was "prejudicial plain error," and the prosecutor's later reinforcement of the incorrect statement of law increased the prejudice caused by the first misstatement. In addition, House argues that no curative instruction in the jury charge could have remedied the prejudicial impact of the misstatement of law because the misstatement may have influenced the jury's impression of the evidence when it was presented at trial. We disagree.

The district court did not plainly err when it made the comment at issue. "We will not reverse a conviction based upon comments of the trial judge unless the comments are so prejudicial as to amount to denial of a fair trial," United States v. Ramos, 933 F.2d 968, 973 (11th Cir. 1991), and we have frequently held that a single isolated comment during a lengthy trial is insufficiently prejudicial to require reversal of a criminal conviction, see, e.g., United States v. Brown, 441 F.3d 1330, 1358 (11th Cir. 2006); Chandler v. Moore, 240 F.3d 907, 912–13 (11th

63

Cir. 2001). We are not convinced that either the district judge's comment alone or the combined impact of that comment and the prosecutor's questions affected the outcome of House's trial. The district court instructed the jury that they could not base their verdict on statements by the parties' attorneys or its own comments, except for its instructions to them regarding the applicable law, and we must assume the jury followed these instructions. United States v. Butler, 102 F.3d 1191, 1196 (11th Cir. 1997). Nor are we convinced that the district judge's comment unduly influenced the jury during the presentation of the evidence. The district court had instructed the jury before the trial began not to allow their "first impressions" to "control" what they thought and not to "start making up [their] mind[s]" about the verdict until they had "heard the whole case." And because the district court sustained House's objection to the prosecutor's question immediately after making the comment at issue, it is unlikely that the jury perceived the comment as an endorsement of the government's position. In any event, neither the district judge's comment alone nor the combined impact of that comment and the prosecutor's questions could have prejudiced House with respect to counts four, seven, nine, or eleven because, as we have already explained, the jury found that the seizures charged in those counts were not supported by probable cause.

2. Statement Regarding Production of Court Records

House argues that the district court erred when it stated that it would obtain the court records that explained the dismissal of Kinnamont's charges if the prosecutor did not have them before the trial was over because "the jury need[ed] to know" why the charges were dismissed. According to House, this statement amounted to a "direct[ion] [to] the government as to the evidence it needed to prove to the jury." House also contends that the district judge's insistence that the jury see the court records may have influenced the jury's determination of whether House had probable cause to stop Kinnamont. We disagree.

The district court did not plainly err. "A district court judge has wide discretion in managing the proceedings[;] he may comment on the evidence, question witnesses, elicit facts not yet adduced or clarify those previously presented, and maintain the pace of a trial by interrupting or cutting off counsel as a matter of discretion." United States v. Day, 405 F.3d 1293, 1297 (11th Cir. 2005) (internal quotation marks omitted). And we have previously held that a district court did not abuse his discretion in managing the trial where he "found the testimony of a witness to be confusing and suggested to the government the manner in which it might be clarified." Id. We are unpersuaded that the statement at issue here was sufficiently prejudicial to have denied House a fair trial. See Ramos, 933 F.2d at 973. The district court instructed the jury to "disregard

anything [the district court] might have said during the trial" except its instructions on the law "in arriving at [their] decision concerning the facts of this case," and "not [to] assume from anything [it] may have said during [the] trial" that it "ha[d] any opinion concerning any of the issues in [the] case." These instructions precluded the jury from considering the statement at issue in appraising the evidentiary significance of the court records. The district court also instructed the jury to "rely only on the facts known to [House] before the stop was made" in determining whether House had probable cause or reasonable suspicion for a stop. This instruction precluded the jury from relying on the eventual dismissal of Kinnamont's charges in determining whether House had probable cause to stop Kinnamont. We must assume the jury followed all instructions given to them. Butler, 102 F.3d at 1196.

### D. The District Court Did Not Err when It Excluded Evidence.

House contends that the district court abused its discretion when it excluded testimony concerning a traffic stop for which House had not been charged and testimony about Georgia law regarding traffic stops and arrests, but we disagree. Testimony concerning a traffic stop for which House had not been charged was irrelevant to any issue of fact before the jury, and the district court correctly excluded it. See Fed. R. Evid. 401, 402. The district court also correctly

66

excluded testimony about Georgia law. "Domestic law is properly considered and determined by the court whose function it is to instruct the jury on the law; domestic law is not to be presented through testimony and argued to the jury as a question of fact." United States v. Oliveros, 275 F.3d 1299, 1306–07 (11th Cir. 2001).

*E.  There Was No Commentary on House's Failure to Testify.*

House argues that the prosecutor improperly commented on House's decision not to testify when the prosecutor remarked to the jury during his closing argument in reference to House's encounters with Padgett, "We don't have the defendant's version of that stop because there is no report about that one. The only evidence you have therefore is that I wasn't doing anything wrong but driving down the road in the left-hand lane and I got stopped for aggressive driving both times." House also contends that the district court compounded this error when it failed to instruct the jury that they were not permitted to draw any adverse inferences from House's decision not to testify. These arguments fail.

The prosecutor did not comment on House's failure to testify. A prosecutor comments on a defendant's invocation of his right not to testify if the "prosecutor's remarks were manifestly intended to urge the jury to draw an inference from the defendant's silence that he or she is guilty," or if "a jury would

naturally and necessarily construe the prosecutor's remarks as inviting such an impermissible inference." United States v. Thompson, 422 F.3d 1285, 1299 (11th Cir. 2005). Whether these conditions are satisfied "can be determined only by examining the context in which the statement was made." Id. Here, the prosecutor observed that House had not filed a report documenting his stops of Padgett to emphasize the fact that the only evidence relating to those stops was Padgett's testimony, which proved that House did not have probable cause to stop Padgett. The prosecutor's remarks encouraged the jury to convict House based on Padgett's testimony, not House's silence, and there is no basis for us to conclude that a jury would have construed those remarks in any other manner. Cf. id. (holding that a prosecutor's remarks were not improper where they were intended to discourage an improper positive inference from the fact that one codefendant did testify rather than to encourage an improper negative inference from the fact that the other codefendant did not testify).

In addition, House has waived his right to challenge his conviction on the basis of the district judge's failure to instruct the jury that they could not draw any adverse inferences from House's failure to testify. When the district court offered to call the jury back into the courtroom and provide such an instruction, House's counsel responded, "We are fine as it is. We don't ask that you bring them back."

This response constituted an invitation of the omission that House now characterizes as error, which means we are precluded from reviewing the alleged error on appeal. See Silvestri, 409 F.3d at 1337.

*F.  House's Argument About Ineffective Assistance of Counsel Will Not Be Reviewed on Direct Appeal.*

House argues for the first time in his reply brief that his counsel was ineffective for his failure to renew his motion for acquittal at the close of all the evidence, but "except in the rare instance when the record is sufficiently developed, we will not address claims for ineffective assistance of counsel on direct appeal," United States v. Merrill, 513 F.3d 1293, 1308 (11th Cir. 2008) (internal quotation marks and alteration omitted). "Instead, an ineffective assistance of counsel claim is properly raised in a collateral attack on the conviction under 28 U.S.C. § 2255." Id. (internal quotation marks and alteration omitted). Moreover, because House raised his claim of ineffective assistance for the first time in his reply brief, we would not review it even if the record were fully developed. See United States v. Dicter, 198 F.3d 1284, 1289 (11th Cir. 1999).

*G.  There Was No Cumulative Error.*

House also argues that the cumulative effect of the errors he has alleged on appeal deprived him of a fair trial, but where there is no error or only a single

error, there can be no cumulative error, see United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004). Because House has identified only a single error in this appeal, his argument of cumulative error fails.

## III. CONCLUSION

We **VACATE** House's convictions on counts one, two, three, and six. We **AFFIRM** House's convictions on Counts four, five, seven, eight, nine, ten, eleven, and twelve. We **REMAND** for further proceedings consistent with this opinion.