[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14702
_____

D.C. Docket No. 1:11-cr-20868-JEM-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALEJANDRO GONZALEZ,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 15, 2014)

Before HULL and MARTIN, Circuit Judges, and HINKLE,[*] District Judge.

MARTIN, Circuit Judge:

Alejandro Gonzalez appeals his convictions for three counts of making false

_____

[*] Honorable Robert L. Hinkle, United States District Judge for the Northern District of Florida, sitting by designation.

official statements, in violation of 18 U.S.C. § 1001(a)(2) (Counts 2, 3, and 5), and one count of obstruction of an agency proceeding (Count 4), in violation of 18 U.S.C. § 1505.  On appeal, Mr. Gonzalez argues that: (1) the government obtained his convictions through a constructive amendment of the indictment; (2) the charges were impermissibly vague as applied to the facts of his case; (3) the District Court improperly refused to instruct the jury on his good faith defense; and (4) there was insufficient evidence to support his convictions.  After careful review, and with the benefit of oral argument, we affirm.

## I.    BACKGROUND

The International Convention for the Safety of Life at Sea (SOLAS) is a maritime treaty that establishes uniform regulations and standards for vessels that regularly travel in international waters.  Nov. 1, 1974, 32 U.S.T. 47, T.I.A.S. 9700; see Regs. 2–4, Annex to SOLAS, 1974.

One of the core requirements of SOLAS is that each "Flag State"—the nation in which each boat is registered and under whose flag the ships sail— regularly inspect and survey the ships flying under the nation's flag to ensure that they are seaworthy and safe to operate.  Reg. 6.[1]  Once the survey is complete, the Flag State issues a Cargo Ship Safety Construction Certificate (Safety Certificate) certifying that the ship has been inspected and meets all of the safety qualifications

---

[1] All citations to SOLAS Regulations are to the numbered regulations in the Annex.

2

of SOLAS.  Reg. 12(a)(ii).  Flag States often entrust the authority to conduct these surveys and to issue the Safety Certificates to classification surveyors who are affiliated with organizations recognized by SOLAS.  Reg. 6.

SOLAS also streamlines the interactions between cargo ships and foreign governments when the ships arrive at ports of call in other countries.  Whenever cargo ships come into foreign ports, the "Port States" have the authority to verify that proper SOLAS certifications are on board each vessel.  Reg. 19.  The Port States also have the authority to conduct port state control examinations to ensure that the ships are in compliance with SOLAS safety regulations.  Reg. 19.  For example, when foreign vessels come into ports in the United States, the United States Coast Guard is authorized to board the ships to verify SOLAS certifications and conduct port state control examinations.  33 C.F.R. § 96.380(a).  If the Coast Guard finds that the vessel is not in compliance with SOLAS, it must prevent the ship from sailing until it can proceed to sea without danger to the passengers or the crew.  Reg. 19; 33 C.F.R. 96.380(b).

Mr. Gonzalez was a registered marine surveyor authorized by the governments of Panama and Bolivia to conduct surveys and issue Safety Certificates for cargo ships sailing under each country's flag.  Apparently, his safety inspections and certifications, as well as his conduct during U.S. Coast Guard investigations, left something to be desired and ran afoul of U.S. law.  A

3

jury convicted Mr. Gonzalez of three counts of making false official statements (Counts 2, 3, and 5 of the indictment) and one count of obstructing an agency proceeding (Count 4).[2] Mr. Gonzalez now appeals his convictions. Counts 2 and 3 relate to Safety Certificates and statements made by Mr. Gonzalez relating to the M/V Galdana, which was later rechristened the M/V New Wave. Counts 4 and 5 relate to a Safety Certificate issued by Mr. Gonzalez for another cargo ship named the M/V Cosette.

### A. COUNT 2: FALSE STATEMENTS TO COAST GUARD INVESTIGATIVE SERVICE AGENT DARREN BOYD

The Galdana was a cargo ship managed and operated by a Miami-based corporation that sailed, among other places, between Miami, Fort Lauderdale, Puerto Rico, New York, Boston, and Haiti. The Galdana first came to the attention of the U.S. Coast Guard when the cargo ship was docked in San Juan, Puerto Rico in August 2008. After a port state control examination revealed that the ship was in serious disrepair, the Coast Guard detained the Galdana until the deficiencies could be remedied. The Coast Guard also requested that the ship provide documentation of the last time that the Galdana had been examined in a dry dock, as well as the date of the next scheduled dry-dock inspection.

Because the Galdana was sailing under the flag of Panama at the time, Mr. Gonzalez, who had been authorized by Panama's government to survey the ship,

---

[2] The jury acquitted Mr. Gonzalez of a conspiracy count (Count 1).

went to San Juan to work with the Coast Guard to address the deficiencies. On August 13, 2008, Mr. Gonzalez sent a letter to the Coast Guard's Prevention Department in San Juan. Among other things, this letter claimed that the Galdana had last undergone a dry-dock inspection in March 2006 in Cartagena, Colombia, where Mr. Gonzalez also claimed that the ship had been extensively repaired.

On April 22, 2009, Agent Darren Boyd of the Coast Guard Investigative Service interviewed Mr. Gonzalez to determine whether the Galdana had in fact been inspected in March 2006. When asked how he knew that the Galdana had been inspected in 2006, Mr. Gonzalez told Agent Boyd that he got it "off a piece of paper" in one of the common areas of the vessel. Mr. Gonzalez claimed that there was no seal, stamp, signature, or country on the document. Nevertheless, Mr. Gonzalez insisted that the March 2006 dry-dock inspection had taken place.

Agent Boyd doubted Mr. Gonzalez's representations. In Agent Boyd's experience, dry-dock inspection reports were much thicker than just one piece of paper. After a thorough investigation, Agent Boyd was also unable to find any evidence or any records to show that the Galdana had undergone a dry-dock inspection in 2006. Nowhere in the Galdana's deck log did it indicate that the ship had traveled to Colombia in 2006 for a dry-dock inspection or for any other reason. This corroborated the Coast Guard's own records of the Galdana's previous ports

5

of call, which contained no indication that the Galdana had traveled to Colombia in 2006.

## B. COUNT 3: FALSE STATEMENTS IN SAFETY CERTIFICATE ISSUED IN HAITI

The Galdana next came to the Coast Guard's attention in September 2009 when the boat was docked in Boston, Massachusetts. After conducting a port state control examination, the Coast Guard again discovered numerous deficiencies aboard the vessel and detained the ship until they could be resolved. In November 2009, Mr. Gonzalez traveled to Boston to address the deficiencies and drafted a report for the Coast Guard verifying that the deficiencies had been corrected.

Before the Galdana could leave Boston, however, the Coast Guard learned that the government of Panama had cancelled all of the ship's safety certificates. With the ship no longer in compliance with SOLAS, the Coast Guard expelled the Galdana from US waters. Panama granted a permit for the Galdana to make a one-time voyage to Sant Marc, Haiti, where statutory renewal surveys would be carried out.

Upon arrival in Haiti, the Galdana changed its flag from Panama to Bolivia and was rechristened the M/V New Wave on December 15, 2009. That same day, Mr. Gonzalez—now acting under the authority of Bolivia—issued a new set of certificates, including an interim Safety Certificate, which allowed the New Wave to resume its cargo operations. On this interim Safety Certificate, Mr. Gonzalez

6

represented that the ship had undergone a dry-dock inspection in 2006. After leaving Haiti, the New Wave traveled directly back to US waters, where the Coast Guard conducted a port state control examination in Miami and reviewed the New Wave's interim Safety Certificate on December 24, 2009. Again, the Coast Guard found no evidence suggesting that this 2006 dry-dock inspection had ever occurred.

## C. COUNTS 4 AND 5: FALSE STATEMENTS IN SAFETY CERTIFICATE ISSUED IN FLORIDA

Counts 4 and 5 both relate to a different cargo ship named the M/V Cosette. Mr. Gonzalez issued a Safety Certificate certifying that the Cosette was fit to sail just weeks before the Cosette arrived in New York harbor in perilous condition.

On November 3, 2009, the Coast Guard conducted a port state control examination of the Cosette while it was docked in Fort Pierce, Florida. During the examination, the Coast Guard could not tell whether the steering gear or the main engine were operational. As a result, the Coast Guard informed the Cook Islands, under whose flag the Cosette was registered, that it would detain the ship until it received documentation that the steering gear and main engine were working properly. Then in short order, the Coast Guard received notice from the Cook Islands that the Cosette would no longer sail under its flag, but instead would be re-registered under Bolivia.

7

Mr. Gonzalez was hired as Bolivia's classification surveyor, and under SOLAS, he was to conduct a full and thorough inspection of the ship and issue new certificates. On November, 13, 2009, Mr. Gonzalez issued an interim Safety Certificate for the Cosette so that the Coast Guard would allow the ship to depart from Fort Pierce. This Certificate stated that based on his survey of the ship, "the condition of the structure, machinery and equipment . . . was satisfactory and the ship complied with the relevant requirements of Chapters II-1 and II-2 of [SOLAS]." Mr. Gonzalez also prepared a written report, reassuring the Coast Guard that after surveying the ship, he concluded that the steering systems and main engines were working properly. Based on Mr. Gonzalez's representations, the Coast Guard cleared the deficiencies that it had previously noted and allowed the Cosette to leave the port of Fort Pierce on November 21, 2009. The Cosette sailed immediately to New York harbor and was inspected by the Coast Guard again on December 4, 2009.

Despite the fact that Mr. Gonzalez had certified the safety of the Cosette just days before, the Coast Guard found that the ship was in hazardous condition. Smoke was escaping from the engine and generator rooms. The hydraulic fuel tank was hot enough to catch fire. Three of the five generators were leaking and had exposed electrical wires, and a fourth generator was not operational at all. The steering gear, which Mr. Gonzalez had stated was working properly, was also in

8

poor condition and suffered from hydraulic leaks.  The ship was in such poor condition that crew members had to cover their faces with shirts and cloths when working near the engine equipment.  In light of the ship's state of disrepair, the Coast Guard immediately required the Cosette to shut down its engines so that tug boats could take control of the vessel.

At trial, the government called to the stand a marine consultant, who testified as an expert in the field of engineering and classification surveying. When asked whether the hazardous conditions on the Cosette could have arisen between November 21, 2009 (when the ship left Fort Pierce) and December 4, 2009 (when the Coast Guard inspected the ship in New York Harbor), the expert testified that it would be inconceivable for all of the problems to have arisen during that 14-day period.  The expert further testified that the problems that the Cosette had when it arrived in New York were long term issues that should have been discovered while Mr. Gonzalez tested the equipment prior to issuing the Cosette an interim Safety Certificate.

## II.    DISCUSSION

### A. CONSTRUCTIVE AMENDMENT

We first address Mr. Gonzalez's argument that his convictions on Counts 3 and 5 were obtained through a constructive amendment of the indictment.  Because Mr. Gonzalez did not raise his constructive amendment argument to the District

Court, we review only for plain error.  See United States v. Dennis, 237 F.3d 1295, 1299 (11th Cir. 2001); see also United States v. Cotton, 535 U.S. 625, 631, 122 S. Ct. 1781, 1785 (2002) (applying plain error review to "forfeited" constructive amendment claim).  We will only reverse for plain error if (1) there is an error, (2) the error is plain, (3) the error affects substantial rights, and (4) not correcting the error would seriously affect the fairness, integrity, or public reputation of judicial proceedings.  United States v. Olano, 507 U.S. 725, 732–37, 113 S. Ct. 1770, 1776–79 (1993).

In Mr. Gonzalez's view, the subsection under which he was charged, 18 U.S.C. § 1001(a)(2), applies only to oral statements, whereas written statements are subject to prosecution only under subsection (a)(3).  Because the statements forming the basis of Counts 3 and 5 were the written certifications, Mr. Gonzalez argues that the convictions could only have been obtained through a constructive amendment of the indictment.

Mr. Gonzalez's effort to frame the issue as one of a constructive amendment of the indictment misses the mark.  A constructive amendment to an indictment occurs when (1) the evidence presented at trial proves a crime different from the conduct charged in the indictment or (2) the District Court's instructions to the jury broaden the possible bases for conviction beyond the basis set forth in the indictment.  See, e.g., Stirone v. United States, 361 U.S. 212, 217–18, 80 S. Ct.

10

270, 273–74 (1960) (finding constructive amendment because indictment alleged obstruction of sand importation, but evidence showed obstruction of steel importation); United States v. Narog, 372 F.3d 1243, 1249–50 (11th Cir. 2004) (finding constructive amendment when judge's instructions in response to jury query referred to general "controlled substances" rather than to "methamphetamine," as was charged in the indictment).

Here, neither the evidence presented at trial nor the District Court's instructions to the jury broadened the bases for conviction beyond the conduct charged in the indictment. Count 3 of the indictment charges that Mr. Gonzalez falsely "stated" that the Galdana/New Wave had a dry-dock inspection in 2006. Consistent with that allegation, the government established at trial that Mr. Gonzalez falsely represented as much in a written safety certificate. The District Court then properly instructed the jury that Count 3 charged that the defendant made "false statements" about the dry-dock inspection. In the same way, Count 5 charged that Mr. Gonzalez made a false "statement" when he "certified" that he surveyed the Cosette and that it complied with SOLAS requirements. Consistent with that allegation, the government presented evidence regarding the 2009 Safety Certificate. The District Court then instructed the jury that Count 5 charged Mr. Gonzalez with making a "false statement" about the Cosette's condition. As this makes clear, the indictment for both charges corresponds directly to the evidence

11

presented at trial and to the instructions given before the jury's deliberations.

Thus, there was no constructive amendment of the indictment at all.

Mr. Gonzalez's argument would be more appropriately framed as an argument that the indictments for the written statements do not state an offense under 18 U.S.C. § 1001(a)(2). To the extent that this is Mr. Gonzalez's argument, we find it without merit.

"When a defendant raises a claim that the indictment fails to state an offense for the first time on appeal, this Court must find the indictment sufficient unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted." United States v. Pacchioli, 718 F.3d 1294, 1307 (11th Cir. 2013) (quotation marks omitted).

We cannot agree that no "reasonable construction" of 18 U.S.C. § 1001(a)(2) covers the conduct upon which Mr. Gonzalez's conviction was based. "As in all cases involving statutory construction, our starting point must be the language employed by Congress, and we assume that the legislative purpose is expressed by the ordinary meaning of the words used." Am. Tobacco Co. v. Patterson, 456 U.S. 63, 68, 102 S. Ct. 1534, 1537 (1982) (quotation marks and internal citations omitted). Section 1001(a) subjects an individual to criminal prosecution if, "in any matter within the jurisdiction of the executive, legislative, or

judicial branch of the Government of the United States," he knowingly and willfully:

> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

Mr. Gonzalez argues that § 1001(a)(2) can only apply to oral communications because a broader interpretation would render § 1001(a)(3) superfluous. It is true that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." United States v. Julian, 633 F.3d 1250, 1255 (11th Cir. 2011) (quotation marks omitted). But for two reasons, it is neither necessary nor appropriate to limit the scope of § 1001(a)(2) to just oral communications.

First, the plain language of § 1001(a)(2) clearly and unambiguously encompasses all means of making a statement or representation, not just oral communications. The rule disfavoring a superfluous interpretation of statutory language "must always yield to plain and unambiguous statutory text," even if that plain language arguably renders some subsections superfluous. Polkey v. Transtecs Corp., 404 F.3d 1264, 1268 (11th Cir. 2005). None of the terms in § 1001(a)(2) explicitly limit the applicability of that subsection based on the means

13

of communication.  Nor could we conclude that a limitation is implied, for words communicated in writing make no less a statement or representation than those same words communicated orally.[3]

Second, even if the language is ambiguous, we do not agree that § 1001(a)(3) is rendered completely superfluous by our broader reading of § 1001(a)(2).  Under our interpretation of the statute, subsection (a)(3) is narrower in that it only applies to written communications, while subsection (a)(2) applies to both oral and written communications.  On the other hand, subsection (a)(3) is in some sense broader than subsection (a)(2) because it applies to using statements as well as making them.  The fact that our interpretation means the subsections cover some overlapping conduct does not render either provision wholly superfluous in the sense we are cautioned to avoid.  See Conn. Nat'l Bank. v. Germain, 503 U.S. 249, 253, 112 S. Ct. 1146, 1149 (1992) ("Redundancies across statutes are not unusual events in drafting, and so as long as there is no positive repugnancy between two laws, a court must give effect to both." (quotation marks and citation omitted)); In re Piazza, 719 F.3d 1253, 1266 (11th Cir. 2013) (applying Connecticut National Bank in interpreting two subsections in a single statute).

---

[3] Our reading is consistent with this Court's precedent, as we have in the past upheld convictions under § 1001(a)(2) premised on written statements.  See United States v. Pena, 684 F.3d 1137, 1144, 1153 (11th Cir. 2012).

14

As a result, we conclude that neither a constructive amendment nor an insufficient indictment tainted Mr. Gonzalez's convictions under Counts 3 and 5, and so affirm both convictions in this regard.

## B.  CONSTITUTIONAL VAGUENESS

Next, Mr. Gonzalez argues that his convictions must be reversed for vagueness.  He first argues that his convictions for Counts 4 and 5 are unconstitutionally vague because the SOLAS certification standards are unclear.  More generally, Mr. Gonzalez also argues, based on United States v. Izurieta, 710 F.3d 1176 (11th Cir. 2013), that any conviction based on a SOLAS violation is unconstitutionally vague because it is not clear that a violation of SOLAS standards could give rise to criminal liability.

Because he did not object on this basis before the District Court, we review only for plain error.  United Sates v. Naranjo, 634 F.3d 1198, 1206–07 (11th Cir. 2011).  "An error is not plain unless it is contrary to explicit statutory provisions or to on-point precedent in this Court or the Supreme Court."  United States v. Schultz, 565 F.3d 1353, 1357 (11th Cir. 2009).

In determining whether a statute is unconstitutionally vague, this Court considers whether the law defines the criminal offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  United States

15

v. Duran, 596 F.3d 1283, 1290 (11th Cir. 2010) (quotation mark omitted).  There is a strong presumption in favor of constitutionality.  Id.

Regarding both his specific challenges to Counts 4 and 5 and his general challenge to all counts based on Izurieta, Mr. Gonzalez cannot establish an error that was plainly contrary to explicit statutory provisions or to on-point, binding precedent.  See Schultz, 565 F.3d at 1357.  He could not cite to any precedent establishing or suggesting that either § 1001(a) or § 1505, or SOLAS for that matter, is unconstitutionally vague.  And Izurieta addresses constitutional vagueness in an entirely different regulatory context.  See 710 F.3d at 1178–79 (noting that the defendant had been charged with violating 18 U.S.C. § 545 based on his underlying breach of 19 C.F.R. § 141.113(c)).  The statute forming the basis of the conviction in Izurieta is not sufficiently similar to any of the violations with which Mr. Gonzalez was charged, nor is the regulatory regime sufficiently similar to SOLAS, for us to conclude that Izurieta is binding, on-point precedent.  Thus, there can be no plain error.[4]

---

[4] We also note that Mr. Gonzalez's specific challenges to Counts 4 and 5 ultimately miss the mark because the precise contours of the SOLAS certification requirements were irrelevant to the jury's resolution of the charges brought against him.  All the jury was required to decide was whether Mr. Gonzalez made a false statement and whether he obstructed the investigation. These questions are governed by quite definite standards that certainly permit ordinary people to understand the conduct that constitutes a violation and prevent arbitrary enforcement.  See Duran, 596 F.3d at 1290.

16

## C.  GOOD FAITH JURY INSTRUCTION

Mr. Gonzalez also argues that the District Court erred when it refused to accept his proposed jury instruction on good faith.[5]  Nevertheless, we find no reversible error here.

"The district court's refusal to deliver a requested instruction constitutes reversible error only if the instruction (1) is correct, (2) is not substantially covered by other instructions which were delivered, and (3) deals with some point in the trial so vital that the failure to give the requested instruction seriously impaired the defendant's ability to defend."  United States v. Ruiz, 59 F.3d 1151, 1154 (11th Cir. 1995) (quotation marks omitted).

Even if Mr. Gonzalez were entitled to a good faith instruction, the District Court's other instructions substantially covered the good faith instruction he requested.  The Court admonished the jury that Mr. Gonzalez could be found guilty of making false statements or representations only if the government proved that he "acted willfully, knowing that the statement was false."  And in its instructions, the Court clarified that "[a] statement is false when made, if it is untrue when made and the person making it knows it is untrue."  As to the obstruction offense, the

---

[5] Our review of the record indicates that Mr. Gonzalez requested an instruction similar to the "Good Faith Defense" instruction listed in the Eleventh Circuit Special Pattern Jury Instructions. Eleventh Circuit Pattern Jury Instructions (Criminal Cases), Special Instruction 17 (2010) ("'Good faith' is a complete defense to a charge that requires intent to defraud.  A defendant isn't required to prove good faith.  The Government must prove intent to defraud beyond a reasonable doubt.").

17

Court explained that "the defendant must have intentionally tried to corruptly influence, impede, or obstruct the pending proceeding." It explained that corruptly "means performed voluntarily, deliberately and dishonestly." Taken together, these instructions are more than sufficient to substantially cover Mr. Gonzalez's requested good faith instruction. On this record, the jury's findings that Mr. Gonzalez acted "willfully" and "corruptly" necessarily required them to reject any arguable good faith defense. See United States v. Martinelli, 454 F.3d 1300, 1316 (11th Cir. 2006) (finding no reversible error where the District Court failed to give a good faith instruction because the instructions on the mens rea element of the offense necessarily required the jury to reject the good faith defense).

## D. SUFFICIENCY OF THE EVIDENCE

Finally, Mr. Gonzalez argues that there was insufficient evidence for the jury to convict him of Counts 2–5. Ordinarily we review de novo the District Court's denial of judgment of acquittal on sufficiency of evidence grounds, viewing the evidence and making all reasonable inferences in favor of the jury's verdict. See United States v. Friske, 640 F.3d 1288, 1290–91 (11th Cir. 2011). However, because Mr. Gonzalez did not move for acquittal or otherwise preserve any argument regarding the sufficiency of the evidence in the District Court,[6] he "must

---

[6] Mr. Gonzalez never moved for a judgment of acquittal on Counts 2, 3, and 5. Although he moved for judgment of acquittal as to Count 4 at the close of the government's case, Mr. Gonzalez failed to renew his motion at the close of his case.

18

shoulder a somewhat heavier burden: we will reverse the conviction only where doing so is necessary to prevent a manifest miscarriage of justice." United States v. Greer, 440 F.3d 1267, 1271 (11th Cir. 2006). This standard requires us to find either that the record is devoid of evidence of an essential element of the crime or "that the evidence on a key element of the offense is so tenuous that a conviction would be shocking." United States v. Milkintas, 470 F.3d 1339, 1343 (11th Cir. 2006) (quoting United States v. Tapia, 761 F.2d 1488, 1492 (11th Cir. 1985)) (quotation marks omitted). In making this determination, we must view the evidence in the light most favorable to the government and accept all reasonable inferences and credibility determinations that support the jury's verdict. Id.

Mr. Gonzalez argues (1) that there was insufficient evidence that the statements regarding the Galdana (Counts 2 and 3) and the Cosette (Counts 4 and 5) were false and made with the intent to deceive; and (2) that the statements were not made "in any matter within the jurisdiction" of the United States government (Counts 2, 3, and 5). Both of these arguments fail.

1. Whether Statements Regarding the Galdana's Dry-Dock Inspection in 2006 Were False and Made with Intent to Deceive (Counts 2 and 3)

Mr. Gonzalez disputes that there was sufficient evidence for the jury to convict him of Counts 2 and 3. Both of these counts are based on Mr. Gonzalez's statements that the Galdana underwent a dry-dock inspection in 2006. To convict Mr. Gonzalez of making a false statement to a government agency in violation of

19

18 U.S.C. § 1001, the government was required to prove: "(1) that a statement was made; (2) that it was false; (3) that it was material; (4) that it was made with specific intent; and (5) that it was within the jurisdiction of an agency of the United States." United States v. House, 684 F.3d 1173, 1203 (11th Cir. 2012) (quotation marks omitted). Mr. Gonzalez specifically argues that there was insufficient evidence at trial showing (1) that his statements were false and (2) that he acted with the specific intent to deceive. Both of these challenges ultimately miss the mark.

First, there was abundant evidence presented at trial that Mr. Gonzalez's statements about the 2006 dry-dock inspection were false. After a thorough search through the Coast Guard's records and the Galdana's bridge logs, Agent Boyd found no evidence that the Galdana ever went to Colombia in 2006 for a dry-dock inspection or any other reason. Mr. Gonzalez was also unable to present a single document supporting his statements about the 2006 inspection. Based on this record, we cannot say that the jury had no evidence that the statements were false, or that the evidence was so tenuous that a conviction would be shocking.

Second, there was also sufficient evidence that Mr. Gonzalez made these statements with the intent to deceive. Mr. Gonzalez argues that his statements regarding the Galdana's 2006 dry-dock inspection merely represented his opinions and the extent of his knowledge. At most, Mr. Gonzalez argues that the

20

government established that he negligently <u>believed</u> that a dry-dock inspection occurred in 2006.  We do not accept Mr. Gonzalez's argument because it is not supported by the record.

During the trial, the government presented plenty of circumstantial evidence suggesting that Mr. Gonzalez knew there had been no dry-dock examination in 2006.  For example, Mr. Gonzalez was the classification surveyor who issued a Safety Certificate for the Galdana in 2006.  Thus, it would have been Mr. Gonzalez's responsibility at the time to find out whether or not the Galdana had undergone a recent dry-dock inspection.

In addition, although Mr. Gonzalez said that he learned the dry-dock inspection occurred from a piece of paper found in the common area of the Galdana, Agent Boyd testified that it is very unlikely that a report of a dry-dock inspection would have been just a single page.  More to the point, this piece of paper was never produced by Mr. Gonzalez or found by the Coast Guard Investigative Service.

Finally, even after Agent Boyd confronted Mr. Gonzalez about his inability to prove that a dry-dock examination had taken place in 2006, Mr. Gonzalez certified again just months later on another Safety Certificate that this 2006 dry-dock examination occurred.  Based on this evidence, the jury could reasonably conclude that Mr. Gonzalez knew that there had been no dry-dock inspection in

2006 and was lying when he said he found a piece of paper on the Galdana indicating that the ship had been inspected. See Friske, 640 F.3d at 1291 ("The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." (quotation marks omitted)).

2. Whether Statements Regarding the Cosette's Condition Were False and Made with Intent to Deceive (Counts 4 and 5)

Mr. Gonzalez next argues that his convictions for Counts 4 and 5 cannot stand because there was insufficient evidence that his statements about the Cosette in the interim Safety Certificate in December 2009 were false or made with the intent to deceive. This argument misses the mark as well.

Mr. Gonzalez primarily argues that a reasonable jury could not determine the truth or falsity of his statements that the Cosette was "satisfactory," "effective," and "fit to proceed without danger to the ship or those on board" without evidence as to what SOLAS requires in order for a ship to be fit to sail. According to Mr. Gonzalez, the government needed to present the specific provisions of SOLAS which governed the Cosette at the time the statements were made so that the jury could determine precisely which safety standards or protocols were breached.

Although we agree that it may have been helpful for the jury to have received more detail about SOLAS's standards, we conclude that the circumstances of this case required no such explanation. Under any definition of

22

the words "satisfactory," "effective," or "fit to proceed without danger to the ship or those on board," there was persuasive evidence that the Cosette failed to meet those standards when it arrived in New York Harbor in December 2009. The jury heard extensive testimony about the ship's many and significant malfunctions when it arrived in New York harbor. The government also presented expert testimony that it would be impossible for such hazardous conditions to have arisen in the two weeks following Mr. Gonzalez's certification in Fort Pierce. From this evidence, the jury could reasonably infer that Mr. Gonzalez's statements about the Cosette were false, even if it did not have the precise SOLAS rules and regulations which Mr. Gonzalez had allegedly breached.

Beyond that, there was also enough evidence at trial for the jury to find that Mr. Gonzalez's statements were made with the intent to deceive. For example, the government's expert witness testified that if Mr. Gonzalez had in fact conducted a complete survey of the vessel—as he was required to do—he would have observed the smoke, leaks and other hazards before signing the Safety Certificates. Thus, the jury could have inferred that Mr. Gonzalez signed the Safety Certificates without conducting a proper safety inspection or any inspection at all.

In addition, the jury also could have easily inferred intent to deceive based on a financial motivation to make false statements. The jury heard testimony that the Cosette would be detained at Fort Pierce until new Safety Certificates were

23

issued and the Coast Guard was satisfied that the ship's engines and steering equipment were functioning properly. It was thus reasonable for the jury to infer that Mr. Gonzalez intended to deceive the Coast Guard so that the Cosette could get on its way and deliver its cargo to the next destination.

3. Whether the Statements Were Made "In Any Matter Within the Jurisdiction" of the Coast Guard (Counts 2, 3, and 5)

Finally, Mr. Gonzalez argues that he cannot be convicted for statements regarding his inspections of the Galdana and the Cosette—even if false—because they were not made "in any matter within the jurisdiction" of the United States government. In particular, Mr. Gonzalez argues that when he issued the Safety Certificates for the Galdana and the Cosette, he made those statements to the governments of Bolivia and Panama in his capacity as a nominated surveyor for those countries. According to Mr. Gonzalez, the United States government had no power over him as a nominated surveyor, and so his statements did not concern "any matter within the jurisdiction" of the United States government.

Before we turn to the merits, we must first determine the proper standard of review to use for analyzing this issue. Mr. Gonzalez and the government both frame the issue as one of subject matter jurisdiction. This suggests that whether Mr. Gonzalez's statements were made "in any matter within the jurisdiction" of the United States is a legal issue that this Court should review de novo. See Pena, 684 F.3d at 1145 n.5.

24

This Court, however, has typically construed attacks on jurisdictional elements as a challenge to the sufficiency of the evidence supporting that particular jurisdictional element. See United States v. Blankenship, 382 F.3d 1110, 1131 (11th Cir. 2004) (construing defendant's claim that the District Court lacked jurisdiction under 18 U.S.C. § 1001 as an attack on the sufficiency of the evidence); United States v. Key, 76 F.3d 350, 353 (11th Cir. 1996) ("Whether the government proved [a] jurisdictional element is measured as a challenge to the sufficiency of the evidence."); see also United States v. McQueen, 727 F.3d 1144, 1152 (11th Cir. 2013) ("But, as we see it, 'any matter within the jurisdiction' is merely a jurisdictional element, for which no mens rea is required."). Thus we analyze this issue using the standard of review for sufficiency of the evidence claims. Because Mr. Gonzalez failed to move for acquittal on Counts 2, 3, and 5, Mr. Gonzalez's convictions can only be reversed if doing so is "necessary to prevent a manifest miscarriage of justice." Greer, 440 F.3d at 1271.

To be a crime under 18 U.S.C. § 1001, a false statement must be made "in any matter within the jurisdiction" of the United States government. The Supreme Court has stated that this jurisdictional element should "not be given a narrow or technical meaning" and applies to "myriad governmental activities." United States v. Rodgers, 466 U.S. 475, 480, 104 S. Ct. 1942, 1946 (1984); Bryson v. United States, 396 U.S. 64, 70, 90 S. Ct. 355, 359 (1969). To satisfy § 1001's

25

jurisdictional element, the false statement must concern the "authorized functions of an agency or department" rather than "matters peripheral to the business of that body." Rodgers, 466 U.S. at 479, 104 S. Ct. at 1946. "A department or agency has jurisdiction, in this sense, when it has the power to exercise authority in a particular situation." Id. In determining whether or not a statement is made "in any matter within the jurisdiction" of the United States government, an important consideration is whether the federal government had any "power over the specific transaction in which the false statements were made." Blankenship, 382 F.3d at 1137. "[T]he key issue in determining whether a statement is within the government's jurisdiction is the authority of the agency to act." Id.

With these principles in mind, we conclude that Mr. Gonzalez's statements regarding the Galdana and the Cosette were made "in any matter within the jurisdiction" of the Coast Guard. Mr. Gonzalez's conviction for Count 2 is clearly valid because the statements were made during an investigative interview of Mr. Gonzalez with Agent Boyd of the Coast Guard Investigative Service. In this sense, Count 2 is very similar to the facts of Rodgers, where the Supreme Court held that § 1001 clearly encompasses false statements made during criminal investigations conducted by the FBI and the Secret Service. Id. at 476–77, 104 S. Ct. at 1944–45. Like the FBI and the Secret Service, the Coast Guard Investigative Service also has statutory authority to "make inquiries, examinations, inspections, searches,

26

seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States." 14 U.S.C. § 89. Because Mr. Gonzalez made false statements directly to a Coast Guard official during the course of an investigative interview, we find that his statements were made "in any matter within the jurisdiction" of the United States government. 18 U.S.C. § 1001(a).

In the same way, there was also sufficient evidence for a jury to find that Mr. Gonzalez's statements regarding the Cosette (Count 5) were "in any matter within the jurisdiction" of the United States government. At the time that Mr. Gonzalez made his statements, the Cosette was in United States waters and was thus subject to the jurisdiction of the United States. See Pena, 684 F.3d at 1146 ("A foreign commercial ship at a U.S. port is subject to the jurisdiction of the United States."). The Coast Guard also had authority to inspect the Cosette and detain it if necessary to ensure the safety of the ship and other vessels in United States waters. 46 U.S.C. § 3303; 14 U.S.C. § 91; 33 C.F.R. 96.380(b) (authorizing detention of vessels until "the vessel can go to sea without presenting an unreasonable threat of harm to the port, the marine environment, the vessel or its crew"). Practically speaking, when Mr. Gonzalez issued the Safety Certificate, he certified to the Coast Guard that the Cosette was fit to leave Fort Pierce, Florida. As a result, we also conclude that the false statements made by Mr. Gonzalez relating to the safety

and seaworthiness of the Cosette were "in any matter within the jurisdiction" of the United States government. See Pena, 684 F.3d at 1153 (upholding conviction under § 1001(a)(2) for Safety Certificate falsely certifying to Coast Guard examiners that ship was in compliance with international pollution regulations).[7]

Count 3 is admittedly quite a bit closer. The evidence at trial suggested that Mr. Gonzalez issued an interim safety certificate in December 2009 falsely stating that the New Wave underwent a dry dock inspection in 2006 in Cartagena, Colombia. Neither the New Wave nor Mr. Gonzalez, however, were in the United States or its waters at the time Mr. Gonzalez issued this certificate. Rather, both Mr. Gonzalez and the New Wave were in St. Marc, Haiti, which was outside of the jurisdiction of the United States government.

Nevertheless, after carefully examining the record, we cannot conclude that the evidence at trial on Count 3 was "so tenuous that a conviction would be shocking," Milkintas, 470 F.3d at 1343, or that reversing this conviction is "necessary to prevent a manifest miscarriage of justice." Greer, 440 F.3d at 1271. The government presented evidence at trial that the Galdana was a cargo ship managed and operated by a Miami-based corporation that regularly sailed to a

---

[7] Mr. Gonzalez also suggested at oral argument that, by ratifying SOLAS, Congress expressly or implicitly provided immunity to nominated surveyors for Safety Certificates that they issue for foreign vessels. We reject this argument. Mr. Gonzalez points to no provisions in SOLAS suggesting that signatory countries sacrifice any of their power to enforce their criminal laws against nominated surveyors. See Pena, 684 F.3d at 1145 (rejecting defendant's argument that United States has no jurisdiction to prosecute a surveyor issuing a Safety Certificate on behalf of Panama under the International Convention for the Prevention of Pollution from Ships).

28

number of US ports-of-call, including Miami (where Mr. Gonzalez also resided), Fort Lauderdale, Puerto Rico, New York, and Boston. The government also presented evidence that Mr. Gonzalez had traveled to US ports in the past to clear up deficiencies with the ship, including Puerto Rico in August 2008, and Boston in December 2009. In fact, the jury heard evidence that Mr. Gonzalez was with the Galdana in Boston when the Coast Guard expelled the ship from US waters to Haiti. Mr. Gonzalez then followed the ship to Haiti (where it was rechristened the New Wave) and issued an interim safety certificate so that the ship could return to US waters and dock in Miami. Based on this record, a jury could have reasonably inferred that Mr. Gonzalez knew that the purpose of his false statements was to deceive US Coast Guard officials and allow the New Wave to return to US waters. As a result, there was sufficient evidence for a jury to conclude that the statements underlying Count 3 were "made in any matter within the jurisdiction" of the United States government.

### III.   CONCLUSION

For these reasons, we affirm Mr. Gonzalez's convictions for Counts 2, 3, 4, and 5.

**AFFIRMED.**